Spring Term
1839.

EJECTMENT.          Lathrop *vs.* The Commercial Bank of
Scioto.

[M. David Trimble and Mr. Apperson for appellant: Mr. Hord for appellee.]

FROM THE CIRCUIT COURT FOR GREENUP COUNTY.

*May* 6.          Chief Justice ROBERTSON delivered the opinion of the Court.

The facts, and   " THE COMMERCIAL BANK OF SCIOTO," in *Ohio*—which was
questions to be
considered.      authorized, by its charter of incorporation granted by
that State, to issue and discount bills &c. and to acquire
land in payment of debts, or for securing debts to which
it should become entitled, in the authorized sphere of its
business—obtained, in the year 1833, a mortgage on a
tract of land in *Greenup* county, *Kentucky*, executed, in
the said county, by *Jacob Clingman*, (the owner,) for the
purpose of securing a debt due to it by the mortgagor,
upon a contract, made in the State of *Ohio*, within the
scope of its prescribed authority.   Afterwards, the Bank
procured from *Clingman* an absolute deed for the same
land, and, before the expiration of the time given by the
mortgage for payment, it placed a tenant on the land;
after which *Aden Lathrop* purchased *Clingman's* title to
the land, under executions issued on judgments which
had been obtained against him by other creditors; and,
having received a conveyance from the sheriff, brought
an action of ejectment against the tenant of the Bank:
upon the trial of which, verdict and judgment were ren-
dered against the *plaintiff.*

Lathrop now urges a reversal of the judgment.

In revising the case, the only question we shall con-
sider is whether the bank acquired a legal title to the
land, or the legal right of entry thereon; for if it did,
*Lathrop's* subsequent deed did not vest in him a legal
right of entry; which, however, he undoubtedly had, if
neither the mortgage nor absolute conveyance to the
bank passed any title.

As to the absolute deed, we shall not now express
any opinion; because, even if it be invalid for alleged

duress or fraud, still, if the mortgage be valid, we have no doubt that it vested in the bank the legal right to enter upon and take the profits of the land by its agent, and to retain the possession until payment or redemption.

The objection made to the mortgage is threefold:—First—that the agent, who made the contract, was not legally appointed. Secondly—that the bank had no authority to make *any* contract *in Kentucky;* and, thirdly—that it cannot hold a legal title to *land* in this State.

*First.* An agency for collecting and securing the debts of a corporation, may be created without a written power of attorney authenticated by the corporate seal. And the conduct of the Bank, and especially in defending this suit, as it did, and yet does, as a party, is a sufficient recognition of the authority and acts of its agent, concerning the mortgage and the occupancy of the land.

*Second.* The debt, for securing which the mortgage was given, having been created by a legal contract in *Ohio*, there can be no doubt that the bank might have maintained a suit upon it, in a court of *Kentucky.* The right of a foreign corporation of a friendly nation or state to prosecute such a suit, is now conceded by an international *comity* recognized in England and in all the States of this confederacy, whenever the maintenance of the action is not inconsistent with some local law or policy of the *forum.* In this respect, so far as mere national comity is concerned, no distinction is now made by just and enlightened nations, between natural and artificial persons. Although no foreign law can, by its own vigor, have an extra-territorial operation, yet wherever any such law creating a corporation, shall be authenticated and recognized, the artificial personage so constituted will be also recognized as a legal being.

As the charter of incorporation imparts to a body politic legal individuality and personality, such a being possesses inherent capacity to act as a person, within istence—provided the action is not inconsistent with the local law or policy of this State.

A corporation, it seems, may, by its agents, make contracts beyond the limits of the State in which it is established—provided they are such as its charter authorizes it to make, and such as are not inconsistent of the local law or policy of the State where they are made.

Spring Term 1839.

*Lathrop* vs *Commercial B'k of Scioto.*

An agency for collecting and securing the debts of a corporation, may be created without the use of the corporate seal.–Resistance by a corporation, to an attempt to recover property which it had acquired by its agent, is a sufficient recognition of the agency.

The comity of modern times concedes to the subjects and citizens of one nation or State, the right to maintain suits in the courts and tribunals of another; and, in this respect, there is, in general, no difference recognized between artificial persons or corporations, and natural persons. And—

A bank, or other corporation, of another State may maintain an action here, upon any contract made with such corporation, and which it had a legal right to make, in the state where it has a legal ex-

the scope of its prescribed authority, so far as may become necessary and proper for effectuating the ends of its creation. And this capacity, to this extent, it possesses as certainly as it could, had it been a natural instead of a merely legal person, or as the natural persons, who are its constituents, possess in their individual rights. Beyond, as well as within, the limits of the domestic sovereign, the only difference between a natural and an artificial person, as to the recognition of their personal existence, would be that, whenever the law creating the latter should be recognized, the existence of such a being would be *legal* only, whilst that of the other would be *actual*, as well as *legal*. And this is the reason why, in the absence of any local law or policy to the contrary, the same code of comity will equally apply to each of them in the courts of all liberal and enlightened nations.

The corporate name and capacity of a body politic are not necessarily local; wherever enlightened law prevails, they may be as ubiquitous and effectual, within the bounds prescribed by the law of their creation, as they could be if they were natural as well as civil. Though a corporation is itself local, yet, like a natural person remaining at the native *domicil*, it may act through the locomotive agency of a natural person, wherever he could go and act for himself, unless its legal capacity be confined by its charter, within prescribed territorial limits, or unless the act to be done be prohibited by the *lex loci acti*.

And the same reason which would entitle a corporation to sue wherever a natural person might sue as a foreigner, should permit it to make contracts authorized by its charter, and not interdicted by the local law or policy of the place of contracting; for the right to prosecute a suit necessarily implies an authority to employ counsel or other agency, and to compromise the suit; none of which may be effectually done without making a contract in the country of the *forum*; and moreover, wherever a corporation shall be recognized as a person with capacity to do one act, it should be admitted to possess equal capacity to do any other act within the scope of

Spring Term
1839.

*Lathrop*
vs
*Commercial B'k
of Scioto.*

its charter, and not inconsistent with the law or policy of the place where the act is to be done. Surely, in the absence of any statute in Kentucky to the contrary, a company incorporated by the Legislature of *Ohio,* for manufacturing iron, or flour, or tobacco, and whose capacity is not expressly circumscribed by the limits of that State, might, according to universal law, make a valid contract, in Kentucky, for selling its manufactured articles, or for buying the raw material. And certainly the State of *Ohio* herself might, by her authorized organ, make a binding contract beyond her own jurisdictional limits.

It seems almost selfevident therefore that the capacity of a corporation may not be confined by the territorial limits of the country of its *domicil*; that it may exist wherever the law of its creation shall be recognized, and may act—*there being no local law to the contrary*—wherever an agent may go and could act in his own right.

These deductions are confirmed by the history of corporations, and judicial decisions concerning them, for more than a century past. Unless, therefore, its capacity shall be confined within territorial limits prescribed by the law of its creation, a corporation, *conformably with the authority of that law,* may make, in a foreign country, any contract which it is not incapacitated or forbidden to make by the *lex loci contractus.* As a corporation derives its faculties from its organic law, it may have no inherent capacity, either at home or abroad, beyond the limits prescribed by that law. But within the boundary of authority thus defined, it may have capacity to sue or to bind itself by contract any where. The same comity which will recognize the law creating a foreign corporation should, in the absence of any local policy or enactment to the contrary, recognize the existence and capacity of the corporation itself.

Although that clause in the federal constitution which declares that " the citizens of each State shall be en-" titled to all privileges and immunities of citizens in the " several States"—may not fully apply to corporations in the several States, yet, as, without that fundamental

Spring Term
1839.

Lathrop
vs
Commercial B'k
of Scioto.

guarantee, an established comity, almost as inviolable, would entitle a citizen of one of the States to make contracts and prosecute suits in any of the other States, we can perceive no reason why the same international law may not, in the absence of any local interdict, equally apply in all the States, to the corporations of each other.

And surely, at least as much of comity as is recognized by the practice of nations perfectly sovereign and independent, must be admitted to prevail among these confederate States. So far as their own local laws and local courts are exclusively concerned, each of the States of our Union acts as a sovereign, independently of each other, and of course, in enacting and administering her own peculiar laws, each State has a perfect and indisputable right to determine, for herself, how far the laws of any other State shall be permitted to operate. So far as the national constitution does not control, each of the States is an independent sovereign, in the enactment of her own laws and in the exposition and enforcement of them by her own local tribunals. And the harmony of the Union, the nature of the commercial and social intercourse among the States, and the family likeness that characterizes all their institutions, should operate as powerful incentives to the observance, by each towards each other, of a comity peculiarly liberal and expansive. Among no other people on earth can comity be so necessary or so useful.

According to the common law, every corporation has a legal capacity to think, and to act, and to make binding contracts. And there is no statute or policy of Kentucky, either incapacitating corporations—merely as such—to make contracts, or outlawing foreign corporations, merely because they are foreign.

There is no law of this State prohibiting a corporation of a sister state from collecting or securing by contract here, a debt due to it by virtue of a contract made in the State under whose laws the corporation is established.

Nor is there any statute of Kentucky disabling the Bank of Scioto to collect, or to secure by contract here, its debt due under a contract made in Ohio. A statute of 1812 concerning "unchartered banks," was, as we are inclined to think, intended to apply only to such associa-

The act of 1812 concerning 'unchartered banks,' seems to apply only to associations in this State; but if it applies also, to foreign banks, it only interdicts agencies and contracts for circulating their notes.

tions existing in this State; but even if it be applicable to all foreign banks not legalized by an express act of the Kentucky Legislature, it only interdicts agencies and contracts for circulating the notes of such banks.

A foreign corporation may, therefore, make some valid contracts in Kentucky.

*Third.* We are thus brought to the last question to be considered: may a foreign corporation, according to the general law of this State, acquire a legal interest in land here by any contract made here or elsewhere?

As to a corporate capacity to make contracts, *the common law* never discriminated between a contract for land and a contract for any other thing. And no doctrine of the common law is more clearly and undeniably established, than that which concedes to corporations an inherent or resulting right to acquire and hold title to land by contract, except so far only as they may be restricted by the objects of their creation, or the limitations of their charters. *Co. Litt.* 44, *a.* 300. *b;* 10 *Co.* 30. *b; Dyer, a. pl.* 70; *Com. Dig. tit. Franchise,* 11. 15. 16. 17; *Kyd on Corp.* 76; 2 *Kent's Com.* 277; *The Banks* vs. *Poitiaux,* 3 *Randolph's Rep.* 141.

And that common law capacity now exists, even in England, except so far as it may be restricted by the statutes of *mortmain* and the royal prerogative of withholding *licenses* from a certain class of corporations in that kingdom.

Now, as we have decided that the *Bank of Scioto* has a legal capacity to make a valid contract here within the scope of its charter, and as that charter concedes to it the right to make contracts for land, either as mortgagee, or as absolute purchaser, for the purpose of securing or collecting debts due to it in its prescribed sphere of business, the mortgage in this case cannot be illegal and void for want of capacity to take it and hold under it, unless, in this particular, the common law of England has been abolished in Kentucky, or, in other

The common law never discriminated between the right of a corporation to contract for land, and its right to contract for any thing else; and there is no doctrine of the common law better settled, than that which concedes to corporations an inherent or resulting right to acquire and hold title to land, by contract,—except so far as they may be restricted by the objects of their creation, or by limitations in their charters.

The common law is the law of Ky.—except so far as it has been changed by statute, or is inapplicable to our institutions; and there has been no change made by statute in respect to the right of corporations to acquire and hold lands.

The laws of this State make no discrimination between the capacity to make binding contracts, as to movable, and as to immovable property. Nor is the right to acquire and hold land here, con-

fined to citizens or residents, or even to natural persons.——As the Bank of Scioto—an Ohio corporation, has the right to contract here, by its agent, within the scope of its charter, which concedes to it the right to make contracts for lands (either as mortgagee or purchaser,) for the purpose of securing its debts acquired in the exercise of its lawful powers—a mortgage made to that corporation, for such a purpose, upon land in this State, is not invalid, but is sanctioned, and must be upheld, by the laws of this State.

words, unless, according to the local law of this State no corporation can, by any contract, acquire any legal interest in land here, without express legislative permission.

It is an universal principle of sovereignty, as inviolable as it is fundamental and conservative, that the right to hold land, and the mode of acquiring title to land, must depend altogether on the local law of the territorial sovereign. Neither the *terra firma* nor other immovable property in a State, and under its exclusive dominion, has ever been subjected to any foreign law. All such property is included within an admitted exception from the radical principle of all comity among distinct sovereignties.

The local law of Kentucky must, therefore, decide whether the mortgage in this case be valid or void.

As to legal capacity to make binding contracts the law of Kentucky does not discriminate between movable and immovable property. Nor is the right to acquire land, in Kentucky, by contract or otherwise, confined by our law, either to citizens or residents here, or even to natural persons.

A citizen of Ohio—not being, in the legal sense, an alien—may hold land in this State by purchase or descent. And our own corporations may also acquire title to land here, by contract, except so far as their common law right to do so may be restricted, expressly or impliedly, by their charters. Nevertheless, we are not prepared to decide that a positive enactment forbidding the corporations of any other State in the Union to enjoy the same privilege, would be inconsistent with the guarantee herein before quoted from the federal constitution.

But is there any such legislative interdiction? As the natural citizens of Ohio may purchase lands in Kentucky, are the same persons disfranchised, in this respect, by the unsubstantial fact that, being incorporated into one aggregate body, by a law of their own State, they make all their contracts in their corporate name and merely legal capacity, instead of making them in their individual names and natural capacities?

The common law of England is the common law of Kentucky, excepting only so far as it has been modified or abolished by the peculiar institutions or the positive enactments of the State. Then, as to the common law right of bodies politic to purchase and hold land, has there been any such modification or abolition in, Kentucky? If not, then the mortgage in this case is legal and valid; because, by the law of its being, the Bank of *Scioto* was endowed with the capacity to take such a security on land; and therefore, as it could, by its agent, make a valid contract in this State, it had a right, through the instrumentality of that agent, to take a mortgage on land here, unless prohibited by our local law.

Spring Term
1839.

*Lathrop*
vs
*Commercial B'k
of Scioto.*

There is no such inhibitory enactment by the Legislature of this State. And certainly, there is nothing in our fundamental institutions inconsistent with the right of any foreign corporation, (composed of persons who are not aliens,) to hold land in this Commonwealth.

We are satisfied, therefore, that the mortgage to the Bank of *Scioto* was sanctioned, and should be upheld by the law of this State, unless the "*mortmain acts*" of England, or so much of them at least as applies to civil corporations, should be deemed to be in force in this State.

By an ordinance of 1776, *Virginia* adopted " the com" mon law of *England*, and all statutes or acts of Par" liament made in aid of the common law; prior to the " fourth year of King James I. and which (were) of a " general nature and not local to that Kingdom."

None of the British mortmain acts were ever in force in Kentucky.

And the eighth section of the sixth article of the constitution of *Kentucky* adopted, with certain qualifications, " all laws which, on the 1st of June, 1792, were in force in the State of *Virginia*."

Unless the British mortmain acts were in force in *Virginia*, on the 1st of June, 1792, they have never been in operation in Kentucky. *Virginia* had never, prior to June, 1792, specially enacted any mortmain statute; and therefore, if the mortmain acts of England, prior to the 4th Ja. I. were all "*local to that Kingdom*," no part

vıı. 16

Spring Term
1839.

*Lathrop*
vs
*Commercial B'k of Scioto.*

of them was ever in force in either *Virginia* or *Kentucky.*

The matter we are now considering is, therefore, brought to the single question—what were the objects and character of the ancient British statutes called "*mortmain acts*?"

When the feodal system prevailed in its fullest vigor in England, the inalienability of land, without the license of the *King*, as Lord paramount, and that also of the intermediate Lord or Lords, was a fundamental law of *tenure.* And even after most of the feodal restraints on alienation, as between natural persons, had "worn away," still a corporation could not purchase land without the license of the *King;* because, otherwise, by the vesting of land in tenants that could never die nor be attainted, he might, without his consent, have been deprived of *escheats* and other feodal profits to which he was entitled, as *ultimate Lord of the fee.* This doctrine, however, which was the foundation of all the mortmain acts, was the offspring of the feodal system, *as it once* prevailed in England, and is inapplicable to free *allodial* titles to land. And therefore, it never could have been recognized as an operative principle of the *common law* in this country; and should not now prevail even in England, had it not been re-enacted by the statutes of mortmain.

The prime objection of the mortmain acts was to repress the alarming influence of *ecclesiastical* corporations, which had, even as early as the *Norman* conquest, monopolized so much of the land in England, that the *Abbot* of *St. Albans* told the *conqueror*, that the reason why he had subjugated the country by the single victory at *Hastings*, was—"because the land, which was the main-" tenance of *martial* men, was given and converted to "*pious* employments, and for the maintenance of holy "votaries."

The 36th ch. of *magna charta*, which was the first statutory enactment on this subject, declares that, "it "shall not be lawful from henceforth, to any to give his "lands to any religious house, and to take the same "lands again to hold of the same house &c. upon pain

"that the gift shall be void, and that the land shall ac-
"crue to the Lord of the fee."

A statute of 7 Ed. I.—after reciting that "services"
incident to fees, "and which, at the beginning, were
"provided for the *defence* of the realm, are wrongfully
"withdrawn, and the *chief Lords* lose their *escheats* of
"the same"—therefore, "ordained that, no persons re-
"ligious, or other whatsoever body politic, ecclesiasti-
"cal or lay, sole or aggregate, shall buy or sell any
"lands or tenements—whereby such lands may, in any-
"wise come into mortmain, under pain of *forfeiture* of
"the same; and within a year after the alienation, the
"next *Lord* of the fee may enter; and for defaults of all
"the mesne lords, the King shall have the lands so alien-
"ated forever, and *shall* enfeoff others by certain *ser-*
"*vices.*"

Spring   Term
1839.

Lathrop
vs
Commercial B'k
of Scioto.

The ecclesiastics having evaded those enactments, by
contriving *recoveries*, and introducing *uses*, a statute of
the 13th Ed. I. and one of 15th R. II. were enacted,
for preventing those evasions. The statute of wills of
H. VIII. did not allow a devise of land to any corpora-
tion. And after the feodal rights of intermediate Lords
had been much circumscribed, and *mesne seigniories* had
almost ceased to exist in consequence of the operation
of the statute of *Quia Emptores*—a statute of 7 and 8 W.
3, provided that the King alone might grant licenses in
mortmain. And this was a prerogative right, not con-
genial with our institutions, and never claimed or exer-
cised by any department of our government, towards
artificial, any more than natural persons.

These are the only enactments which can have any
material application to the present subject of enquiry;
and it is evident that the statutes of 7 E. I. and that of
*wills* of H. VIII., are the only ones which apply to *civil*
corporations.

*Mortmain*, or *mort maine* in French, meaning a dead
hand, was applied to prescriptive and prerogative corpo-
rations, anciently existing to a mischievous extent in
England; because, according to *Hottoman* and *Polydore
Virgil*, they were *immortal;* and therefore land held by
them, was considered as in dead hands, so far as feodal

Spring Term
1839.

*Lathrop*
vs
*Commercial B'k*
*of Scioto.*

services and profits and escheat to the Lords and to the crown were concerned.

According to *Lord Coke* and others who have written on the subject, two objects only were contemplated by the mortmain acts which we have quoted: first—to prevent a withdrawal of the feodal services in defence of the realm; and, second—to secure to the Lords and Crown their escheats and other seigniorial privileges and profits. And the statute of 7 E. I. which is the only one which could affect this case, shows expressly, on its face, that it was enacted for effectuating those two ends alone.

Now, whether we consider the objects or the peculiar provisions of those statutes, it seems to us, that they should be deemed to have been local in their policy and operation.

Neither of the objects of them was ever consistent with the allodial titles and the peculiar habits and institutions of the North American colonies, and the more especially, after they became free and independent States.

*Their* corporations were comparatively few, and were generally statutory and limited in their power and *duration*. Their lands were superabundant, and cheap, and to a great extent, unappropriated and uninhabited. They tolerated no feodal vassalage, exacted no feodal service, and desired no escheats to *Lords* or to *Kings*. Generally, in *Virginia*, there could have been no forfeitures to *Lords*, and the very opposite of the motives in *England* for a forfeiture to the Crown was eminently the interest and policy of *Virginia*.

Who would have been entitled to the *forfeiture*—the *King*, or *Virginia*? If the *King*, why should the Colony have recognized any law enacted for *such an end*? And if *Virginia*—how could *she* execute the statutes by *enfoeffing* others to hold " *by military services*," which would have been subversive of her *fundamental institutions*?

The provisions of those statutes could never have been literally executed in *Virginia*. Moreover, it has been the settled policy of *Virginia* and of the other

States of our confederacy, to allow civil corporations to hold land. And the Virginia statute of wills and that of Kentucky, unlike that of H. VIII. in this respect, *permit corporations to take lands by devise. And why, therefore, may they not be equally entitled to acquire title to land by conveyances inter vivos? The same policy must apply to purchase and devise.*

*Chancellor Kent* says, in his Commentaries, that none of the *British* statutes of mortmain were in force in any of the Colonies or States of North America, excepting only *Pennsylvania.* And the only reason why they were ever considered to be operative in that State, to any extent, was because the charter to *Penn* was understood as embracing and adopting them. The same eminent jurist decided, in the case of *Silver Lake Bank* vs. *North*, (4 *Johnson's Ch. Rep.* 370,) that a corporation in *Pennsylvania* could enforce a mortgage on land in *New York*, taken to secure a debt contracted in the course of its regular business, as prescribed by its charter.

Our researches have not enabled us to find any intimation, legislative or judicial, in the State of Virginia, at any time or in any way, that any of the mortmain acts of England have ever been considered in force in that State. And not only is this a strong fact against the assumption that those acts were operative there, but there are some positive indications of an opinion that they were never recognized as the law of that Commonwealth. In 1661, just after the restoration, the colonial Legislature of Virginia passed a declarative act for certifying what statutes were in force in that colony; and among all these, we find none of the mortmain acts. And, in the case of *The Banks* vs. *Poitiaux*, (3 *Randolph*, 141,) Judge *Green* used the following language:—" The " creation of a corporation gives to it, amongst other " powers, as incident to its existence, and without any " express grant of such powers, that of buying and sel- " ling. 10 *Coke*, 306. This power may be limited, re- " strained, or prohibited, either by the charter creating " the corporation, or by a general law, *as in England*, by " the statutes of mortmain, which provide that if lands " be conveyed to a corporation, the next *Lord* may enter

Spring  Term
1839.

*Lathrop*
vs
*Commercial B'k*
*of Scioto.*

"for a forfeiture; and if he do not enter within a limited "time, that then the *King* may; but, until entry, the es- "tate continued in the corporation.  15  *Viner,* 491." Here is a clear intimation that the mortmain acts were not in force in Virginia; for, if they were, why did this Judge of the Supreme Court of that State say—" as in *England,* by the mortmain acts" &c.?  Why did he not say " as in *Virginia,* by the mortmain acts," or " as, by the mortmain acts?"  He evidently intended to charac- terize them as statutes peculiar to *England,* and as inap- plicable to *Virginia.*

And in  England, too, it has been decided, more  than once, that those statutes were local in  their  policy  and operation, and not applicable to any of the *British* colo- nies.  In the case of the *Attorney General* vs. *Stewart,* (2 *Merivale,* 161,) *Sir Wm. Grant, Master of the Rolls,* de- cided that, the mortmain acts of England  were  inappli- cable to the *British* colony of  *Grenada:* and speaking of the mortmain act of Geo. II., which was but an exten- sion of the prior statutes of mortmain, he said—" The " thing to be prevented was a mischief in England, and " it was by the quality and extent of the mischief, as  it " *there* existed, that the propriety of legislative interfer- " ence upon the subject was to be determined.  The " statute begins by referring to the ancient laws made " against alienations in mortmain.  *None of the causes in* " *which those laws originated had ever had any existence in the* " *colonies.*  It was in *England* that the mischief had in- " creased, and in *England only,* was it thought necessary " to impede its progress.  To no other part of the do- " minions of the crown was this law extended.  In *Ja-* " *maica,* the wealthiest of our  West Indian possessions, " it has not, to this day, been thought necessary, to " guard against any such evil.  I do not, indeed, know " that any  colonial  legislature has made any regulation " on the subject, although, in *none* of the *old* colonies can " the mortmain act have any operation."

In *Rex* vs. *Vaughan, Lord Mansfield* said—" The argu- " ment is strong that certain statutes do not extend to " *Jamaica,* though enacted before that Island belonged to " the crown of England.  If *Jamaica* was a conquest,

"they would retain their old laws till the conqueror "thought fit to alter them: if a colony, these statutes "are positive regulations of justice, not adapted to the "circumstances of new colonies, and therefore no part "of that law of England which every colony from ne-"cessity is supposed to carry with them at their first "plantation."

And Blackstone says:—" Colonists carry with them "only so much of the English law as is applicable to "their own situation and the condition of an *infant* "colony."

Without further amplification, the foregoing considerations are sufficient, in our judgment, to authorize the conclusion, that the mortmain acts of England were altogether *local*, and that none of them were ever applicable or considered applicable to *Virginia*, where the peculiar evils felt in *England*, never existed; where there never was a monopoly of lands by corporations, either religious or civil; where there never was any trace of the feodal system, which begot and nourished those statutes; where corporations were few and not only harmless, but useful, and, for many purposes, necessary, and therefore were favored; where, too, they were generally limited in their powers and *duration*, and where most corporate bodies were permitted to purchase land, and *all were allowed to acquire it by devises.*

And if those statutes were not applicable to Virginia in 1776, they were not adopted by the ordinance of that year, which embraced only such statutes as were " of a general nature and not local" to England.

It is therefore our opinion that none of the mortmain acts of England are, or ever have been, in force in Kentucky.

The fact, that most acts of incorporation in this State concede a special authority to purchase land for *specified* purposes, does not imply that there is any mortmain act which can operate here. That course of legislation has arisen, either from a prevailing opinion that statutory corporations in this country should possess no other powers than those expressly granted, or from a prudential determination to limit and define their rights and ca-

Spring Term
1839.

*Lathrop*
vs
*Bank &c.*

The policy of the British mortmain acts seems to be inapplicable to a corporation, like the Bank of Scioto, whose duration is limited to a short period. A *mortgage* taken, in good faith, merely to secure a debt, & which may be redeemed at any time, should not be considered as a *purchase*, within the scope of the British mortmain acts.

pacities with precision, and especially in relation to the purchase of real estate.

We are strongly inclined to the opinion also, that the policy of the British *mortmain* acts is inapplicable to such a corporation as the *Bank of Scioto*, whose existence is limited to the short period of a few years. Such a being cannot be considered " *immortal*," nor should its hand be deemed or called, in the *English* sense, " *a dead hand*."

We are also inclined to the opinion that a mortgage, taken *in good faith* for securing a just debt, should not be considered as a purchase of land within the scope and objects of the mortmain acts of England; such a conveyance is only a collateral security, and may be avoided, at any time, by payment or redemption; and therefore, it would seem that land thus mortgaged, should not be deemed to be in the *unyielding* grip of a dead hand.

We conclude that no mortmain act operates in this case.

Nor are we able to perceive that any known policy of Kentucky will be violated by permitting a corporation of another State to hold land here as mortgagee, or even purchaser, *as well as devisee*—in which latter character its right would be unquestionable. When the legislative department has not indicated any such local policy, it is not the province of the *Judiciary* to assume its existence, or to establish it. On the contrary, we should rather presume its non-existence, especially as to the corporations of a sister state, and as our own institutions, of the same kind, are permitted to acquire lands by devise and purchase. Such an invidious policy might possibly be deemed inconsistent with a becoming comity between kindred and united States, one and indivisible, in a national sense, and for the same common ends.

If such a policy should ever be deemed proper and useful, the legislative counsels of Kentucky may, at any time, announce it; and thus guard against any possible mischief that might be apprehended from permitting any

corporations not created by Kentucky to hold lands here, *either by contract or by devise.*

But even were the mortmain acts in force here, they would be unavailing to *Lathrop,* in this suit; because they would have the effect only of forfeiting the land, the title to which would, nevertheless, have passed to the *bank,* by the mortgage, and would have there abided until *office found* in favor of the Commonwealth. ·

A sale of land to an unlicensed corporation in England, was not void. The title passed from the *vendor.*

Consequently, if the mortmain act of 7 Ed. I. were admitted to be in force in this State, there was no legal right of entry in Clingman, when Lathrop purchased his interest under execution; and therefore, whether the Bank of Scioto had a title indefeasable by the Commonwealth or not, Lathrop had no right to evict its agent or tenant in this action.

We have not considered any question concerning *alien* corporations.

Nor have we considered the common law doctrine as to perpetuities; because, even if it could be applicable to a conveyance to an *endless* corporation, without any limitation on the right of alienation, still it would be clearly inapplicable to the *mortgage* to the *Bank of Scioto,* whose legal existence is limited to a few years.

Wherefore, as, upon the whole case as presented by the record, we perceive no substantial error to the prejudice of the plaintiff in error, the judgment against him is affirmed.

VIII. 17

Spring Term
1839.

*Lathrop*
vs
*Commercial B'k of Scioto.*

Were the mortmain acts in force here, still a conveyance to a corporation, contrary to their inhibitions, would vest the title in such corporation where it would remain till office found: an individual would take nothing by subsequent purchase from the same vendor.