White, J.
If the transaction by which the Ohio Life Insurance .and Trust Company obtained the bonds and guaranty be found valid, the judgment of the court below must be reversed; and it will be unnecessary to inquire whether the plaintiff holds the bonds ;and guaranty exempt from the infirmities to which they might be ■subject in the possession of its assignor.
The first and main question in this case is whether the transaction by which it is claimed the Trust Company acquired the bonds ..and guaranty in question, was legal.
The plaintiff, and the general assignee of the Trust Company, who is made a defendant, and who still holds part of the bonds, maintain the affirmative. They claim the nature of the transaction to have been a purchase of one hundred and twenty-five thou *141 sand dollars of the bonds of the Junction Railroad Company, at. par, by the Trust Company, and that the guaranty was given and' accepted as one of the terms of, and to effect the sale.
*The defendants claim the transaction (1) to have been a loan at an illegal rate of interest, and for that reason void; (2) that the Junction Railroad Company had no power to issue and negotiate, in the State of Ohio, bonds bearing interest at the rate of ten percent. per annum.
Independent of special statutory provisions this transaction would clearly be a loan. It would be the case of a party obtaining money-upon his own promises to repay it; and, wherever usury laws exist, when this is the case, the transaction necéssarily imports a loan Whatever form it may be made to assume. For, if this were not so,» laws prescribing the rate of compensation for the use of money could be evaded and nullified at the pleasure of the parties. But in. the absence of any such laws, or, in regard to transactions excepted . from their operation, where they exist, contracts in consideration. of money or its use stand upon the same footing as contracts for • any other species of property/ These laws rest upon considerations of policy applicable to the ordinary business of the country;, and it is the province of the legislature to declare what laws on this-' subject public policy requires, and what classes of enterprise, if any, should be exempted from their operation.
Upon what footing, then, do the statutes place the transaction between the Ohio Life Insurance and Trust Company and the Junction Railroad Company, now in controversy ? "Were the bonds vendible securities while in the possession of the latter company? If not, they could not be sold, and the transaction was necessarily a-loan. But if the law impressed upon them the merchantable quality' of property,-for the purpose of enabling the corporation by which they were made, to go into the market and raise money by their-sale, and sales were accordingly made, we are unable to perceive ■ any satisfactory grounds upon which courts can be required, for - the purpose of invalidating the transaction, to pronounce that to ■ be a loan which the statute has authorized as, and declared to be, a sale.
The parties to any such transaction must undoubtedly have the ■ requisite capacity, and for want of it their supposed purchase would fail. But if the parties are competent, and *the transaction be otherwise unobjectionable, it can not be defeated on the ground-. *142 'that, ordinarily, and in the absence of the statutory authority, it -would be regarded as a loan.
If the transaction in question might lawfully be either a purchase -of bonds by the Trust Company or a loan of money, it becomes a mere question of fact to determine its real character—what the parties intended it to be, and, in fact, made it.
That a sale of the bonds was intended and supposed to have been made in the present case, by all of the parties, is clear from the evidence.
The resolution of the board of directors of the railroad company ¡authorized the president “ to sell the bonds at such rate or price as he ■..may deem expedient.” The resolution of the board of directors of the Trust Company only authorized their president to purchase 'them; It is recited by the defendants in their guaranty as a sale. This, and the testimony of the witnesses and the books of the Trust ‘Company, leave no doubt of its having been intended as a purchase ■of bonds, and not a loan of money. As a loan, at the rate of interest specified, it would have been clearly illegal; and where a transaction is susceptible of two constructions, one rendering it unlawful and the other lawful, that should be adopted which will uphold it.
The objection that the bonds were transferred to the Trust Company for a loan of money, having been for the present disposed of, the material question remains; whether the sale of the bonds by the .Junction Railroad Company to the Trust Company, was authorized by law? The answer to this question involves the following in•quiries: 1. Had the parties to the supposed sale the capacity to make it, supposing it to be otherwise unobjectionable ? 2. If they -had, was such sale forbidden by the laws or the settled policy of ■this state, the situs of the transaction ?
As to the first question : There can be no doubt of the power of ■the Junction Railroad Company, derived from the legislature of the •State of Indiana, to make and sell these bonds. Section 1 of the ,amendment to the charter, passed January 29,1851, authorized the •company to sell, dispose of, and negotiate its own bonds, bearing any rate of interest, *within or without the state, at such rates and for such prices as it might deem for its interest, and declared that sales at a discount should be as valid in every respect as ■sales made at par.
The law authorizing these bonds, and under which alone they *143 derive any legal validity for any purpose, impresses upon them, in the hands of the maker, the same vendible qualities as are possessed by other personal securities in the hands of lawful holders. The power to make and sell its own bonds is one of the corporate rights of the Junction Railroad Company. That such bonds would be as fully the legitimate subject of sale by the company in Indiana -as they would be by a person who held them as owner, or as any other personal securities, can not be denied. And they would possess the same qualities, and the company would have the same right to sell them elsewhere, if not prohibited by the lex loci acti. 8 Dana, 116; Angell & Ames on Corp., secs. 104, 105, 161.
It is true, the railroad company is a corporation created by the State of Indiana; but it is well settled that, by the law of comity among nations, a corporation created by one sovereignty is permitted to make contracts in another, and that the same law of comity prevails among the states of the Union. The Bank of Augusta v. Earle, 13 Peters, 520; Pickaway County Bank v. Prather et al., 12 Ohio St. 499.
The corporation must show that the law of its creation gives it authority to do the act which it seeks to perform, and that it is not prohibited by the lex loci. In Lathrop v. The Commercial Bank of Scioto, 8 Dana, 116, it is said: “Beyond as well as within the limits of the domestic sovereign, the only difference between a natural and an artificial person, as to the recognition of their personal existence, would be that, whenever the law creating the latter should be recognized, the existence of such a being would be legal only, while that of the other would be actual as well as legal. And this is the reason why, in the absence of all local law or policy to the contrary, the same code of comity will equally apply to each of them in the courts of all liberal and enlightened nations.”
The next question is: Was the Ohio Life Insurance and *Trust Company endowed by its charter with capacity to purchase the bonds? If we are correct in our conclusion as to the merchantable character of these bonds, it is clear that it was so endowed. By the nineteenth section of the charter, the trustees are given discretionary power to invest the premium and profits received by the company, and the moneys received by them in trust, in “ such real or personal securities as they may deem proper,” or loan the same to any county, city, incorporated town or company.”
The scope of the power to purchase is co-extensive with the se *144 curities named, and is not limited to such securities as were the?-, subjects of sale at the date of the charter. Whatever real or personal securities might be lawfully- sold, the Trust Company was-authorized to buy; and the exercise of the power is limited neither-as to time nor place. The creation of salable securities, under-statutes passed after the date of the charter of the Trust Company, only multiplied the objects upon which the power conferred by the-charter might be exercised. If the purchase of the bonds had? been made in Indiana, it seems clear that its legality could not. have been impugned. Yet, so far as the transaction is assailed on the ground of the want of capacity in either of the parties, the-objection would have had the same effect, had the purchase been made in Indiana, as it is entitled to have in the present case. We-are of opinion that, if the transaction be otherwise lawful, it will, not fail for want of power in the Trust Company.
We now recur to the second question : Was the sale prohibited, by the laws or settled policy of this state ?
Two grounds are urged by the counsel of the defendants upon.which it is claimed this question should be answered in the affirmative: 1. That the statutes of this state authorizing railroad compa-nies to issue and negotiate their bonds, require that they shall’ bear a rate of interest not exceeding seven per cent, per annum,., while those in question stipulate for ten; 2. The second—which has already been partially considered—is, that, by our laws, the-transaction in question is reduced to a loan.
The policy of the state is found in its laws. The only statutes *relating to railroad companies, material to be noticed, and', which were in force at the date of the negotiation in question, are-section 14 of the act providing for the creation and regulation of incorporated companies, passed Mayl, 1852 (1 S. & C. Stat. 279),. and section 1 of the act relating to the sale of bonds of railroad? companies, passed December 15, 1852 (1 S. & 0. Stat. 321).
The 14th section of the act first named, like section 13 of the-general railroad law of 1848, authorizes railroad companies to borrow money, at a rate of interest not exceeding seven per cent, per' annum, and to execute their bonds or notes therefor.
Owing, doubtless, to the inability of the companies to obtain-money upon the terms authorized, the act secondly above referred. to was passed. The first section provided:
“ That the directors of any railroad company, authorized to bor *145 row money and to execute bonds and notes therefor, shall be, and they are hereby, authorized to sell, negotiate, mortgage, or pledge-such bonds or notes at such times and in such places, either within or without the state, and at such rates and for such prices as, in the-opinion of the directors, will best advance the interest of the company; and if such notes or bonds are thus sold at a discount, such sale shall be as valid in every respect, and such securities as binding for the respective amounts thereof,” as if they were sold at their par value.
This act left the prices at which the bonds might be sold to the discretion of the directors.
It is claimed by the plaintiff’s counsel, that since the passage of this act the rate of interest which the bonds may be made to bear is immaterial. Though it is true the act does not prescribe the-form of the bonds, yet, in a case where the only authority for issuing bonds bearing a higher rate of interest than seven per cent, had to» be derived from these statutes, it might be fairly claimed that it was-only such bonds as the company could -have issued for money borrowed that it was authorized to sell, and that, consequently, the-bonds ought not to bear a higher rate of interest than they could, by law, have borne before the sale was authorized. But, however *this might be, the plaintiff does not rely upon these statutes to support its bonds.
The defendants invoke the aid of the statutes to invalidate the-sale of the bonds, bn account of the rate of interest specified in them. The object of the acts in question is to regulate the exercise of powers by corporations deriving their authority from this state.
Before the policy upon which they are founded can be held, if at all, to invalidate a sale of the bonds of a corporation of a sister-state, the repugnancy must lie plain and substantial. A mere difference in the rate of interest, when the bonds may be sold at any price, creates no such repugnancy.
The second objection, last referred to, has already been in part-considered. It rests upon the idea that this transaction is to be determined upon the rules ordinarily applied to transactions arising under usury laws. This view we regard as erroneous. It deprives the transaction of the aid of the statute under which the bonds were created, and by which their legal qualities were fixed.
The United States, the State of Ohio, and the various corporations of this state, under the authority of statute law, have issued ' ' *146 their bonds for sale, and have sold them not only in the markets of ■our own country but in the markets of Europe. Such sales, at whatever discount made, have not been, nor can they properly be, .regarded as violations of the usury laws in force where the bonds ■have been sold. Most of the bonds issued by railroad companies under the statutory authority of this state, have been sold greatly below their par value, in eastern states and in different countries in Europe, where usury laws prevail. We have not heard of laws being passed in those states or countries exempting such sales from the usury laws; nor do we suppose there have been any. Yet, upon the theory sought to be maintained in this case, all such supposed sales made on behalf of.the corporations making the roads, were in fact not sales but loans, and if so, the transactions were, under the usury laws of the place, either partially or wholly void.
The true ground upon which these transactions are based is this: When the legislature authorizes any corporation to *raise money by the sale of its bonds, such bonds are as salable in the ’hands of such company as in the hands of third persons. It is bona fide business papei’, made so by statute, as soon as made, and entitled to be so treated.
The fact that a guaranty was given is not decisive of the character of the transaction. It is a circumstance to be looked to in ■determining whether its true character was that of a sale or a loan. A guaranty may be given to effect the sale, and be accepted as one •of its terms; and, when such is the case, the' transaction is not thereby converted into a loan. It is a security, it is true, for the payment of the bonds; so is a mortgage; but the mere fact that 'bonds are secured, whether by the personal liability of third persons, or otherwise, renders them not the less subjects of sale. While •■such guaranties may be given as a cover to disguise a loan, they may also be made for the purpose of. effecting a sale ; and, in the the latter case, will pass to the purchaser. Of the last description, in our opinion, is the guaranty now in question.
The learned counsel for the defendants, in speaking of this transaction, remark: “ The whole transaction was between parties on both sides, not only well advised, but every one of them selected .and placed where they were for their intelligence and skill in such •matters.”
We have no doubt this remark is just. We will add, in closing •this branch of the case, the language of the chief justice in Bank *147 of Augusta v. Earle, 13 Pet. 597: “ It is but justice to all the parties concerned to suppose that these contracts were made in good faith, and that no suspicion was entertained by either of them that these engagements could not be enforced. Money was paid on them by one party and received by the other. And when we see men dealing with one another openly in this manner, and making contracts to a large amount, we can hardly doubt what was the generally received opinion at that time in relation to the right of the plaintiffs to make such contracts. And when a court is called on to declare contracts thus made to be void, upon the ground that they conflict with the policy of the state, the line of that policy should be very clear and distinct to justify the court in sustaining the defense.”
* Another ground of defense, claimed on behalf of the defendants, is, that the guaranty was intended to indemnify the Trust Company specially, and was not divisible nor assignable, nor in fact assigned to the plaintiff.
As to the matter of fact alleged, we are all satisfied that there was an agreement, on the part of the Trust Company, that the plaintiff, on taking the bonds, should share in the security of this guaranty in proportion to its number of bonds. And whilst we do not deem it necessary to elaborate the point, suffice it to say, that, whatever might be the case at law, we are unanimous in the cpinion that if the transaction were otherwise valid in equity, the plaintiff would be entitled to share in the benefit of this guaranty with the holders of the other bonds mentioned therein.

Judgment reversed and cause remanded.

Scott and Dat, JJ., concurred.