## HENDERSON et al. v. JIMMERSON et al.

### No. 6506.

Court of Civil Appeals of Texas.
Texarkana.

Nov. 2, 1950.

Rehearing Denied Dec. 7, 1950.

D. S. Meredith, Jr., Marcus F. Vascocu, Longview, for appellants.

Gordon R. Wellborn, Paul S. Colley, Jr., Henderson, for appellees.

LINCOLN, Justice.

J. H. Jimmerson and his wife, Mrs. E. B. Jimmerson, were the owners in community of four tracts of land in the Robert Bell Survey in Rusk County, aggregating about 218 acres, their homestead. On June 14, 1938, they executed an instrument in form of a general warranty deed to C. D. Henderson, the husband of their daughter Monnie Jimmerson Henderson. At that time Mr. Jimmerson was about 76 years of age and Mrs. Jimmerson was about 68 years of age. They had been married 53 years. The recited consideration was $2,200 cash, which sum was paid by two checks of C. D. Henderson, drawn on a Longview bank, for $1,100 each, one payable to Mr. Jimmerson and the other to Mrs. Jimmerson. The instrument reserved life estates in the lands in favor of each of the grantors.

By instrument dated March 24, 1944, Jimmerson and wife executed, acknowledged and delivered to C. D. Henderson their quitclaim deed, by the terms of which they sold, released and quitclaimed unto the said C. D. Henderson all of their right, title and interest in the minerals in the four tracts of land, including all rights of ingress and egress thereon, consideration being $10 cash, and "other good and valuable considerations to us in hand paid by C. D. Henderson * * * the receipt of which is hereby acknowledged." J. H. Jimmerson died November 24, 1947, and there was no administration upon his estate and no necessity therefor.

This suit was originally brought by his surviving wife, Mrs. E. B. Jimmerson, and by certain of their children against C. D. Henderson and his wife, Monnie Hender-

son, to cancel and set aside the two foregoing deeds. The ground for cancellation of the original warranty deed to Henderson was that it was a mortgage to secure the payment of a loan of $2,200, and was executed and delivered by the Jimmersons with the verbal understanding and agreement that if and when the debt of $2,200 (the recited consideration), was repaid to the Hendersons they would reconvey the land to Mrs. Henderson's parents, Mr. and Mrs. Jimmerson. The ground for cancellation of the mineral quitclaim deed was asserted to be that just prior to the time of its execution the Hendersons represented to the Jimmersons that they had a chance to lease the land and that by so doing they could apply the amount received for the lease, and any future rentals and royalties, to the debt owing by the Jimmersons to Henderson and that when the debt was paid the land would be reconveyed. During the pendency of the suit Mrs. Jimmerson died intestate and there was no administration nor necessity therefor upon her estate. All the heirs at law of the original grantors were made parties to the suit.

At the conclusion of the trial the court overruled defense motions for an instructed verdict and submitted the case upon special issues, in response to which the jury found:

(1) That at the time of the execution of the instrument dated June 14, 1938, purporting to be a warranty deed absolute upon its face, it was agreed and understood between J. H. Jimmerson and his wife, Mrs. E. B. Jimmerson, and C. D. Henderson and his wife, Monnie Henderson, that when the sum of $2,200 was paid back to C. D. Henderson and wife, the Hendersons would reconvey the land to the Jimmersons and their heirs.

(2) That Mr. and Mrs. Jimmerson executed the instrument of June 14, 1938, in reliance upon such agreement and promise, and would not have executed such instrument if such promise and representation had not been made to them.

(3) The instrument of March 24, 1944 (the mineral quitclaim deed), was executed by the Jimmersons upon an agreement and understanding with the Hendersons that such instrument would be in trust to the Hendersons in order that the latter might lease the land and apply the proceeds to the payment of the original indebtedness of $2,200, and that when such indebtedness was paid and satisfied the Hendersons would reconvey the property in controversy to the Jimmersons and their heirs.

(4) The Jimmersons relied upon such agreement and promise in the execution of the instrument of March 24, 1944, and would not have executed said instrument if such promise and representation had not been made to them.

(5) The Hendersons have received from leases and rentals $3,255; they have paid taxes on the land in the sum of $132.66.

(6) On June 14, 1938, the reasonable market value of the land in controversy was $20 per acre.

The evidence supported the foregoing jury findings.

The trial court overruled the defendants' motion for judgment notwithstanding the verdict of the jury, and upon motion of the plaintiffs entered judgment as prayed for by the plaintiffs, cancelling and annulling the two instruments, and decreeing that the land belonged to the heirs of Mr. and Mrs. Jimmerson in the proportions provided by the law of descent and distribution, with the exception of one of the heirs, who had assigned and transferred his interest to another of the heirs and thereafter filed his disclaimer. From this judgment the Hendersons alone have appealed.

The answer of the defendants consisted in part of a motion for summary judgment upon the ground that the appellees, plaintiffs below, relied upon an oral promise to reconvey and that such promise was not enforcible under the statute of frauds. The court overruled the motion and appellants assert error in this action of the trial court. We cannot agree with this position of the appellants. "It is settled that parol evidence may be received to show that a purported deed was in fact in-

tended as a mortgage." Austin v. Austin, 143 Tex. 29, 182 S.W.2d 355, 357, opinion adopted by the Supreme Court, and citing numerous authorities. This court, in Jones v. Parker, 193 S.W.2d 863, 864, error refused, N.R.E., held that a deed absolute in form, may be shown by parol to be in reality a mortgage, and that such parol agreements are not in contravention of the statute of frauds. In Bradshaw v. McDonald, 147 Tex. 455, 216 S.W.2d 972, 974, the Supreme Court gave an exhaustive analysis of the origin and judicial history of the rule, pointing out that "As early as 1848 this court declared that it was established beyond question that parol evidence was admissible to control the clear import of an absolute deed, and to show that the deed, though absolute on its face, was intended as a mortgage. Stamper v. Johnson, 3 Tex. 1." That case expressly overrules any holdings, or apparent holdings, of Texas courts to the contrary. These decisions, and many others, sustain the action of the trial court in denying appellants' motion for summary judgment insofar as it relates to the instrument of June 14, 1938.

The third amended original petition asserts that the mineral deed of March 24, 1944, was given to C. D. Henderson in trust for the purpose of enabling him to execute a lease on the lands and apply the lease money and rentals and royalties to payments on the debt owing to Henderson by the Jimmersons. The rule permitting parol testimony to be admitted to show that a deed absolute on its face is a mortgage, as held in the authorities cited above, has been extended to admit parol testimony to show that a deed absolute on its face was given in trust, with the qualification, however, that the consideration is executed and not contractual. Tieman v. Dyer, Tex.Civ.App., 114 S.W.2d 169; Robinson v. Faville, Tex.Civ.App., 213 S.W. 316; Kidd v. Young, 144 Tex. 322, 190 S.W.2d 65. In Jones v. Parker, supra [193 S.W.2d 864], this court said that "From almost the beginning of the statehood of Texas it has been held repeatedly that a trust in land can be created by parol

as well as in writing." Clearly, the recited consideration in the quitclaim (mineral) deed was an executed consideration, and the allegations of the amended petition referred to do not contravene the statute of frauds. The action of the trial court in denying appellants' motion for summary judgment on the grounds presented is sustained as to both instruments.

Appellants' second point of error asserts that the trial court erred in overruling appellants' motion for summary judgment upon the ground that the appellees (plaintiffs below) had judicially acknowledged that their contract was based upon an agreement, in violation of public policy, to defraud the government with respect to old age pensions.

The original petition was in form of trespass to try title. The second amended petition filed by appellees was also in form of trespass to try title, but in addition it averred specific grounds of action having reference to the circumstance under which the two deeds were executed. Among other things stated in the second amended original petition it was asserted that the Jimmersons were in a condition of financial distress and were not eligible to receive old age pensions because of the ownership of the land sued for; that Mr. and Mrs. Henderson then approached Mrs. Henderson's parents with a scheme whereby the Jimmersons could obtain old age pensions by deeding their land to the Hendersons, who would pay them $2,200 in cash; that this money would be sufficient for them to live on until they could be placed upon the old age pension rolls, that then they would be eligible for the pensions after which the Hendersons would reconvey the land to the Jimmersons; that this was a part of the inducement for the execution of the deeds.

However, appellees filed their third amended original petition "in lieu of all other pleadings heretofore filed." It was the third amended original petition upon which the plaintiffs went to trial. That amended petition made no reference whatever to the matter of old age pensions,

such as was alleged in the second amended original petition. The point raised is controlled by the Rules of Civil Procedure and by decisions construing them. Rule 63 authorizes amendment of pleadings. Rule 65 provides that the amended pleading shall be a substitute for the prior pleading and that the prior pleading "shall no longer be regarded as a part of the pleading in the record of the cause," except under certain circumstances named in this rule, none of which apply in this case. "It is of the essence of an amendment that it completely supersedes the pleading intended to be amended * * *. Hence what is stated in the original cannot be relied on after an amendment (other than a trial amendment) has been filed. The earlier pleading is abandoned and passes out of the case, and may not. be relied upon by the parties or looked to by the courts * * *." Vol. 8, Tex.Jur.Supp., p. 146, Sec. 95. The text is supported by many citations. To this effect is the decision in Putty v. Faulkner, 214 S.W.2d 831, decided by this court. See also Hunt v. Employees Reinsurance Corporation Tex.Civ.App., 219 S.W.2d 483, writ refused N.R.E. Evidence was introduced by appellants on their motion for summary judgment, including the second amended petition, but there was no evidence then or thereafter that the appellees executed either of the deeds with the intent to defraud the government. The introduction in evidence of the second amended original petition was not effective for that purpose. None of the witnesses were questioned about it. This point of error is overruled.

The 3rd, 4th and 5th points of error challenge the rulings of the court on admissibility of testimony. Bess Jimmerson, a witness for plaintiff, and one of the children of Mr. and Mrs. Jimmerson, was permitted to testify to conversations had with the defendant Monnie Henderson, the wife of C. D. Henderson. By Point 3 appellants assert error on the ground that these conversations with Monnie Henderson should not have been admitted because it nowhere appears in the evidence that Monnie Henderson was authorized or empowered to act for or on behalf of her husband, C. D. Henderson. Point 4 asserts error in the admission of testimony "with respect to that which Monnie Henderson may have said because there is no evidence that she was authorized to act for or make agreements binding upon C. D. Henderson." By Point 5 appellants assert that the trial court erred "in admitting hearsay testimony with respect to the agreement had by and between Mr. and Mrs. Jimmerson and C. D. Henderson." We must assume that each of these three points of error relate to the same transactions, that is, to conversations which Monnie Henderson had with her sister Bess Jimmerson and her parents, Mr. and Mrs. Jimmerson. In effect these points present for consideration whether Monnie Henderson was the agent of her husband in the transactions leading to the execution of two written instruments described.

Neither the husband nor the wife is in law the general agent of the other, but either spouse may appoint the other as agent, in which event the one so authorized may perform all acts within the scope of the authority granted except where the statutes provide otherwise. 23 Tex.Jur., p. 146, et seq. In 23 Tex.Jur. p. 299, Sec. 259, it is said: "The wife's separate legal entity being recognized, it follows that she may act in any representative capacity unless forbidden by law. She may be the agent for another to do any act which that other could lawfully do, and in the performance she acts precisely as would a feme sole, doing not only the principal act but every incidental or necessary one. She may thus act for a stranger or for her husband as well. The agency may pertain to any lawful transaction, whether of contract, tort liability, conveyance or act whatsoever."

In Parrott et ux. v. Peacock Military College, Tex.Civ.App., 180 S.W. 132, 133, it is said:

"There is no provision in our laws which incapacitates the wife from acting as agent for her husband, and the law of agency, as between husband and wife, is

the same as between any other two persons."

In Burleson v. Graves et ux., Tex.Civ. App., 255 S.W. 1013, 1014, it is said upon authority of cases cited that: "It has been repeatedly held that the wife may act as the agent of the husband, and that such agency may arise from the conduct of the parties as well as by express authority." See also Crutcher v. Sligar, Tex.Civ.App., 224 S.W. 227, writ refused, citing additional authorities.

There is no evidence that C. D. Henderson personally conducted any negotiations leading up to the execution of the two deeds. The evidence abundantly shows that Mrs. Henderson carried on such negotiations through conversations with Bess Jimmerson and with her father and mother. In deference to the findings of the jury we must assume that such conversations were held as are described in the testimony of the plaintiffs. Mrs. Henderson testified, but her testimony is limited to denials of such conversations. There was no attempt upon her part to relate what actually occurred. The evidence shows that in early 1938 Bess received a letter from her sister Monnie in which Monnie stated that she had a plan whereby the parents could get some relief from their distress occasioned by the depression, and that she (Monnie) would be down in a few days to explain it. In about ten days Monnie came to the home of her parents and she and Bess engaged themselves in a conversation. Bess Jimmerson relates the following took place: "She (Monnie) said, if Papa and Mamma would agree to let them take over the place that she would loan them some money on it and asked me what I thought about it, and I told her my objection to that was I had known old people to dispose of their homes and then spend the rest of their lives very unhappy and she said that it would not be like that, and she said, at any time that they become dissatisfied or wanted the place back that they would deed the place back to them. And I told her that at Father's age they would not be likely to be able to pay the money back and then

she said if there was ever any oil activity down there they could and I told her I didn't believe they would ever do it, but that she could ask them." The deposition of Mrs. E. B. Jimmerson shows that Mrs. Henderson agreed with Mr. and Mrs. Jimmerson that the Hendersons wanted to take over the land in order to help out her father and mother, that they had an understanding or agreement with Mrs. Henderson that if her parents would deed them the land they would deed the land back whenever the Jimmersons got dissatisfied or whenever the Jimmersons paid back the money advanced to them. Mrs. Jimmerson states that she had confidence in her daughter and did not read the deed and signed it by her mark. Mr. Jimmerson also stated that she requested Monnie that the land be reconveyed to her and her husband, but that Monnie told her she could not now do it because the three-year time limit for this to be done had passed. She said it was the first time she had ever heard of a three-year time limit.

The testimony shows that Mr. Henderson spent the night at the home of the Jimmersons the night before the deed was executed. When the deed was executed and delivered to the Hendersons it was placed of record by Mr. Henderson in the County Clerk's Office, and as already stated, Mr. Henderson issued his two checks for $1,100 each in payment of the consideration recited in the deed. Neither Mr. nor Mrs. Henderson denied that she was acting for and on behalf of her husband. On the other hand, they both asserted by pleading and evidence that the deeds were absolute and not given as mortgages nor in trust. By their own pleadings and testimony they show that Mrs. Henderson was the agent of Mr. Henderson to obtain both deeds.

■ With respect to the mineral deed, the testimony further shows that Mrs. Henderson was again the moving party in its execution. She came to her parents and related that they could lease the land to the Texas Company for $5 an acre, that this could not be done unless her father and mother would execute to Mr. Hender-

son a quitclaim deed to the minerals. This was probably because the deed retained a life estate in the Jimmersons. The money and all rentals on the lease were to be applied to the loan. When the mineral deed was executed Mrs. Henderson went to G. S. Jones, a notary public, requested him to go out to the home of the Jimmersons, take the acknowledgments and she furnished the transportation for the notary public to do this. Mrs. Henderson was present at the signing, and when the mineral deed was executed it was delivered to her. Thereafter, it was recorded in the deed records of Rusk County, and Mr. and Mrs. Henderson joined in an oil and gas lease to the Texas Company and received $10 an acre for the lease. The quitclaim deed was dated on March 24, 1944, and the lease to the Texas Company was April 12, 1944, only 18 days later. There is other testimony in the record bearing upon these transactions but the above is sufficient to show the tenor of it all. We hold the facts and circumstances are sufficient to show that Mrs. Henderson, in procuring the execution of the two deeds and in all the negotiations leading up to them, was the agent of her husband. Being such, he is bound by all the conversations and negotiations complained of between Mrs. Henderson and her parents. And this is so even though she exceeded her authority in those negotiations, as expressly held by this court in the case of Hamill v. Samuels, 135 S.W. 746.

But even if the evidence were not sufficient to show agency vel non, we think it is sufficient to show ratification on the part of C. D. Henderson. In an early Kentucky case, Lathrop v. Commercial Bank of Scioto, 8 Dana 114, 38 Ky. 114, 33 Am. Dec. 481, it is held that a bank in defending a suit sufficiently recognizes the authority and acts of one purporting to be its agent. In Lawson v. Bank of Bladenboro, 203 N.C. 368, 166 S.E. 177, 179, the Supreme Court quoted from 21 R.C.L., p. 927, Sec. 106, as follows: "Ratification of the unauthorized acts of one assuming to act as agent may be either express or implied: express as by spoken or written words; implied, when the conduct of the principal constitutes an assent to the acts in question. And the acts of the principal, it seems, will be liberally construed in favor of a ratification. One of the most unequivocal methods of showing a ratification of an agent's unauthorized act is the bringing of an action or basing a defense thereon."

In Lilly v. Yeary, Tex.Civ.App., 152 S.W. 823, 825, it is held that "Agency on the part of the wife to act for the husband may be presumed from the acts or conduct of the parties." The same case quoted from Walling v. Hannig, 73 Tex. 580, 11 S.W. 547, as follows: "Marriage alone confers on the wife an agency under which she may buy necessaries for herself and children, if her husband fails to do so. *But a further agency may be presumed from the conduct of the parties.*" (Emphasis added).

Payment by C. D. Henderson of the consideration for the first deed, accepting the mineral deed from his wife to whom it was delivered, having both deeds recorded, granting an oil and gas lease in a short time thereafter at $10 per acre instead of $5, and contesting and defending this suit after knowledge of all the facts— these as well as other facts and circumstances in the case, were sufficient to show ratification of the acts of Mrs. Henderson in purporting to act as agent for her husband. "Ratification has a retroactive efficacy; it relates back to the inception." 2 Tex.Jur., p. 498, Sec. 101. The principal is bound by the representations, declarations and admissions of his agent made within the actual or apparent scope of his authority and while acting on behalf of the principal. This rule is elementary; and it is immaterial whether the principal knew that such representations, declarations and admissions were made. 3 C.J.S., Agency, § 236-a, pages 146-147. The principal cannot accept the benefits of his agent's acts and repudiate the obligations thereby incurred. It would do violence to all equitable considerations to permit that to be done. Our views are

ably expressed by Judge Fly in the case of D. Sullivan & Co. v. Ramsey, Tex.Civ.App., 155 S.W. 580, 589, where, in a somewhat similar case, he quoted with approval the following statement of Judge Williams of the Galveston Court of Civil Appeals in Barbee v. Spivey, 32 S.W. 345, 347: "If, as claimed by plaintiff, Stringfellow alone made the agreement, though without previous authority from defendant, we do not think that it is true that the latter could take the deed, even if he did not know of the agreement with which it had been made, and hold it, contrary to the agreement upon which it was given, disregarding the rights reserved to plaintiff. He could not repudiate the transaction in part and enforce it in part. Accepting the benefits of Stringfellow's acts, he took them with their infirmity, unless he was in an attitude to claim the protection given to an innocent purchaser, which the evidence does not show."

We might add that Judge Williams also made the following additional statement germane to the present case: "If the deed is considered a mortgage, defendant was in no worse position after accepting it than before."

Agency of Mrs. Henderson for her husband having been established by the evidence, the conversations of Mrs. Henderson complained of were representations, declarations and admissions made by her while acting within the scope of her authority and on behalf of her husband, and were binding upon him. Accordingly, Points Nos. 3, 4 and 5 are overruled.

By Point 6 appellants assert that the trial court erred in permitting introduction in evidence of conversations had by J. H. Jimmerson during his lifetime in disparagement of his title, which he had theretofore conveyed by warranty deed. In the statement under this point of error appellants' brief sets out the specific language challenged by showing that the plaintiffs' witness Rousseau was permitted to testify with reference to a fence line between the Jimmerson property and the property of the witness, and that Jimmerson stated to the witness at that time that he considered he was still the owner of the land; that the witness Matlock was permitted to testify that Jimmerson said that he owned the land and the timber; and that the witness Jim Wood was permitted to testify as follows: "Mr. Jimmerson told us his daughter had advanced $2,200.00 and that he would have to pay that money back before he could sell the timber, however, he said he had lifetime right to the timber and that he would take it up with his daughter, and I agreed to furnish the money for him to pay the daughter back and then we would trade on the timber." This witness was further permitted to testify: "Yes, we went back to see him to see if his daughter had deeded the timber back to him so the title would be clear and she refused to do it." And still further the witness testified that: "When Jimmerson's daughter would not permit him to sell the timber he was pretty much torn up and cried."

It is the general rule that statements by grantor in derogation of his title, and made long after his deed has been executed and delivered, will not be received in evidence. But it is also the rule as stated in 17 Tex.Jur., p. 597, Sec. 249: "Declarations of a person made while in possession of property, although in their nature self-serving and hearsay, are admissible to explain the nature and character of his possession and to show the extent of his interest and the character of his holding."

Mr. and Mrs. Jimmerson remained on the land and were in possession of it at all times from June 14, 1938, until their deaths. The testimony of the witness Rousseau shows that he owned the land adjacent to the Jimmerson land. It appears that they both recognized that certain fences were not on the line and that a fence included a part of the Rousseau land. Rousseau had understood that there was some kind of an agreement between Jimmerson and his daughter, and desired to get the fences on the line during his lifetime, evidently to avoid any trouble about it thereafter. It was while engaged in this discussion and under these circumstances that Rousseau testified that Jimmer-

son told him to go ahead and leave the fence like it was, that he considered he was still the owner of the land. This conversation, we think, comes within the rule last above cited.

The evidence shows that witness Matlock walked over the land with Jimmerson, looking at the timber with a view of buying it, discussing the timber deal. We state the entire substance of his testimony: "Mr. Jimmerson told me he wanted to sell the timber and that he had borrowed some money on it and wanted to straighten it up before he passed away and he said he was getting old and he wanted to sell the timber; that was the conversation I had with him. * * * He said he owned the land, but that he had to raise some money to settle off some accounts that he owed on the place. He said he got the money from his daughter Monnie."

The statements above detailed, in our opinion, fall within the rule last stated and were admissible.

 There is an additional reason why this point of error cannot be sustained with reference to the testimony of the witness Matlock as complained of. In the foregoing quotation of his evidence it appears that other evidence was admitted concerning which no complaint is made on this appeal. The only portion of Matlock's evidence that is complained of is that which is briefed, that is, that Jimmerson told the witness Matlock that "he said he owned the land and timber." We have no disposition to be technical, but we do not have authority to pass on errors, if any, not complained of on this appeal. The testimony of Matlock that Jimmerson told him that "he wanted to sell the timber, that he had borrowed some money on it and wanted to straighten it up before he passed away * * * he wanted to sell the timber * * that he had to raise some money to settle off some accounts that he owed on the place * * * that he got the money from his daughter Monnie," are facts in evidence leading to the conclusion that Jimmerson claimed to own the land. No complaint is here made challenging the

admissibility of these facts. The rule is well established that error in admitting testimony is harmless if other evidence of the same facts are admitted and without complaint. The testimony that Jimmerson told Matlock that he, Jimmerson, owned the land and timber is testimony of a conclusion or opinion of Jimmerson. It is our opinion that the error, if any, was harmless.

As to the error claimed in admission of Wood's testimony, the record shows that Wood was requested by a Mr. Clark to finance Clark so he could buy the timber on the Jimmerson land. The timber ran into so much money that Wood stated he wanted to look it over himself. He did that in company with Mr. Jimmerson. While looking over the timber he inquired of Mr. Jimmerson as to his claim of ownership of the land and as to his right of possession of the property. It was in response to that inquiry that the testimony of Wood first above quoted was made. The record further shows that after the first conversation Wood saw Jimmerson again concerning the timber and it was upon this subsequent occasion that Jimmerson made the statements set out in the last two quotations from Wood's testimony. We believe that this testimony also comes within the rule to which we have referred.

 The text already quoted, 17 Tex. Jur., page 958, also makes the following statement, which is supported by numerous authorities cited: "The fact that a person in possession of property makes a claim of ownership or asserts that it belongs to him is no evidence of title and is inadmissible to prove the truth of the claim; but it is the best possible evidence to prove that he claims the property, and may be shown to prove the character of the possession held by him at the time of making the declaration and to account for and explain the same."

 The testimony of the three witnesses complained of does not show statements of Jimmerson in disparagement of Henderson's title, but it is in explanation of the character of Jimmerson's possession,

720

and is in accord with his claim that Henderson's paper title was nothing more than a mortgage and trust.

■ In this case the appellants pleaded various statutes of limitation. The testimony herein discussed would likewise be admissible on the issue of whether Jimmerson's possession was adverse. Purdy v. Pruitt, Tex.Civ.App., 112 S.W.2d 808, error dismissed; Smith v. Briggs, Tex. Civ.App., 168 S.W.2d 528, error refused. We feel constrained, therefore, to overrule this point of error.

Finding no error authorizing reversal, the judgment of the district court is affirmed.