**FRIGALIMENT IMPORTING CO., Ltd., Plaintiff,**

v.

**B.N.S. INTERNATIONAL SALES CORP., Defendant.**

United States District Court
S. D. New York.
Dec. 27, 1960.

———◆———

Riggs, Ferris & Geer, New York City (John P. Hale, New York City, of counsel), for plaintiff.

Sereni, Herzfeld & Rubin, New York City (Herbert Rubin, Walter Herzfeld, New York City, of counsel), for defendant.

FRIENDLY, Circuit Judge.

■ The issue is, what is chicken? Plaintiff says "chicken" means a young chicken, suitable for broiling and frying. Defendant says "chicken" means any bird of that genus that meets contract specifications on weight and quality, including what it calls "stewing chicken" and plaintiff pejoratively terms "fowl". Dictionaries give both meanings, as well as some others not relevant here. To support its, plaintiff sends a number of volleys over the net; defendant essays to return them and adds a few serves of its own. Assuming that both parties were acting in good faith, the case nicely illustrates Holmes' remark "that the making of a contract depends not on the agreement of two minds in one intention, but on the agreement of two sets of external signs—not on the parties' having *meant* the same thing but on their having *said* the same thing." The Path of the Law, in Collected Legal Papers, p. 178. I have concluded that plaintiff has not sustained its burden of persuasion that the contract used "chicken" in the narrower sense.

■ The action is for breach of the warranty that goods sold shall correspond to the description, New York Personal Property Law, McKinney's Consol. Laws, c. 41, § 95. Two contracts are in suit. In the first, dated May 2, 1957, defendant, a New York sales corporation, confirmed the sale to plaintiff, a Swiss corporation, of

> "US Fresh Frozen Chicken, Grade A, Government Inspected, Eviscerated
>
> 2½–3 lbs. and 1½–2 lbs. each all chicken individually wrapped in cryovac, packed in secured fiber cartons or wooden boxes, suitable for export
>
> 75,000 lbs. 2½–3 lbs. . . . . . . @$33.00
> 25,000 lbs. 1½–2 lbs. . . . . . . @$36.50
> per 100 lbs. FAS New York

> scheduled May 10, 1957 pursuant to instructions from Penson & Co., New York." [1]

The second contract, also dated May 2, 1957, was identical save that only 50,000 lbs. of the heavier "chicken" were called for, the price of the smaller birds was $37 per 100 lbs., and shipment was scheduled for May 30. The initial shipment under the first contract was short but the balance was shipped on May 17. When the initial shipment arrived in Switzerland, plaintiff found, on May 28, that the 2½–3 lbs. birds were not young chicken suitable for broiling and frying but stewing chicken or "fowl"; indeed, many of the cartons and bags plainly so indicated. Protests ensued. Nevertheless, shipment under the second contract was made on May 29, the 2½–3 lbs. birds again being stewing chicken. Defendant stopped the transportation of these at Rotterdam.

This action followed. Plaintiff says that, notwithstanding that its acceptance was in Switzerland, New York law con-

---

[1] The Court notes the contract provision whereby any disputes are to be settled by arbitration by the New York Produce Exchange; it treats the parties' failure to avail themselves of this remedy as an agreement eliminating that clause of the contract.

trols under the principle of Rubin v. Irving Trust Co., 1953, 305 N.Y. 288, 305, 113 N.E.2d 424, 431; defendant does not dispute this, and relies on New York decisions. I shall follow the apparent agreement of the parties as to the applicable law.

Since the word "chicken" standing alone is ambiguous, I turn first to see whether the contract itself offers any aid to its interpretation. Plaintiff says the 1½–2 lbs. birds necessarily had to be young chicken since the older birds do not come in that size, hence the 2½–3 lbs. birds must likewise be young. This is unpersuasive—a contract for "apples" of two different sizes could be filled with different kinds of apples even though only one species came in both sizes. Defendant notes that the contract called not simply for chicken but for "US Fresh Frozen Chicken, Grade A, Government Inspected." It says the contract thereby incorporated by reference the Department of Agriculture's regulations, which favor its interpretation; I shall return to this after reviewing plaintiff's other contentions.

The first hinges on an exchange of cablegrams which preceded execution of the formal contracts. The negotiations leading up to the contracts were conducted in New York between defendant's secretary, Ernest R. Bauer, and a Mr. Stovicek, who was in New York for the Czechoslovak government at the World Trade Fair. A few days after meeting Bauer at the fair, Stovicek telephoned and inquired whether defendant would be interested in exporting poultry to Switzerland. Bauer then met with Stovicek, who showed him a cable from plaintiff dated April 26, 1957, announcing that they "are buyer" of 25,000 lbs. of chicken 2½–3 lbs. weight, Cryovac packed, grade A Government inspected, at a price up to 33¢ per pound, for shipment on May 10, to be confirmed by the following morning, and were interested in further offerings. After testing the market for price, Bauer accepted, and Stovicek sent a confirmation that evening. Plaintiff stresses that, although these and subsequent cables between plaintiff and defendant, which laid the basis for the additional quantities under the first and for all of the second contract, were predominantly in German, they used the English word "chicken"; it claims this was done because it understood "chicken" meant young chicken whereas the German word, "Huhn," included both "Brathuhn" (broilers) and "Suppenhuhn" (stewing chicken), and that defendant, whose officers were thoroughly conversant with German, should have realized this. Whatever force this argument might otherwise have is largely drained away by Bauer's testimony that he asked Stovicek what kind of chickens were wanted, received the answer "any kind of chickens," and then, in German, asked whether the cable meant "Huhn" and received an affirmative response. Plaintiff attacks this as contrary to what Bauer testified on his deposition in March, 1959, and also on the ground that Stovicek had no authority to interpret the meaning of the cable. The first contention would be persuasive if sustained by the record, since Bauer was free at the trial from the threat of contradiction by Stovicek as he was not at the time of the deposition; however, review of the deposition does not convince me of the claimed inconsistency. As to the second contention, it may well be that Stovicek lacked authority to commit plaintiff for prices or delivery dates other than those specified in the cable; but plaintiff cannot at the same time rely on its cable to Stovicek as its dictionary to the meaning of the contract and repudiate the interpretation given the dictionary by the man in whose hands it was put. See Restatement of the Law of Agency, 2d, § 145; 2 Mecham, Agency § 1781 (2d ed. 1914); Park v. Moorman Mfg. Co., 1952, 121 Utah 339, 241 P.2d 914, 919, 40 A.L.R.2d 273; Henderson v. Jimmerson, Tex.Civ.App.1950, 234 S.W. 2d 710, 717–718. Plaintiff's reliance on the fact that the contract forms contain the words "through the intermediary of:        ", with the blank not filled, as negating agency, is wholly unpersua-

sive; the purpose of this clause was to permit filling in the name of an intermediary to whom a commission would be payable, not to blot out what had been the fact.

■ Plaintiff's next contention is that there was a definite trade usage that "chicken" meant "young chicken." Defendant showed that it was only beginning in the poultry trade in 1957, thereby bringing itself within the principle that "when one of the parties is not a member of the trade or other circle, his acceptance of the standard must be made to appear" by proving either that he had actual knowledge of the usage or that the usage is "so generally known in the community that his actual individual knowledge of it may be inferred." 9 Wigmore, Evidence (3d ed. 1940) § 2464. Here there was no proof of actual knowledge of the alleged usage; indeed, it is quite plain that defendant's belief was to the contrary. In order to meet the alternative requirement, the law of New York demands a showing that "the usage is of so long continuance, so well established, so notorious, so universal and so reasonable in itself, as that the presumption is violent that the parties contracted with reference to it, and made it a part of their agreement." Walls v. Bailey, 1872, 49 N.Y. 464, 472–473.

■ Plaintiff endeavored to establish such a usage by the testimony of three witnesses and certain other evidence. Strasser, resident buyer in New York for a large chain of Swiss cooperatives, testified that "on chicken I would definitely understand a broiler." However, the force of this testimony was considerably weakened by the fact that in his own transactions the witness, a careful businessman, protected himself by using "broiler" when that was what he wanted and "fowl" when he wished older birds. Indeed, there are some indications, dating back to a remark of Lord Mansfield, Edie v. East India Co., 2 Burr. 1216, 1222 (1761), that no credit should be given "witnesses to usage, who could not adduce instances in verification." 7 Wigmore, Evidence (3d ed. 1940), §

1954; see McDonald v. Acker, Merrall & Condit Co., 2d Dept.1920, 192 App.Div. 123, 126, 182 N.Y.S. 607. While Wigmore thinks this goes too far, a witness' consistent failure to rely on the alleged usage deprives his opinion testimony of much of its effect. Niesielowski, an officer of one of the companies that had furnished the stewing chicken to defendant, testified that "chicken" meant "the male species of the poultry industry. That could be a broiler, a fryer or a roaster", but not a stewing chicken; however, he also testified that upon receiving defendant's inquiry for "chickens", he asked whether the desire was for "fowl or frying chickens" and, in fact, supplied fowl, although taking the precaution of asking defendant, a day or two after plaintiff's acceptance of the contracts in suit, to change its confirmation of its order from "chickens," as defendant had originally prepared it, to "stewing chickens." Dates, an employee of Urner-Barry Company, which publishes a daily market report on the poultry trade, gave it as his view that the trade meaning of "chicken" was "broilers and fryers." In addition to this opinion testimony, plaintiff relied on the fact that the Urner-Barry service, the Journal of Commerce, and Weinberg Bros. & Co. of Chicago, a large supplier of poultry, published quotations in a manner which, in one way or another, distinguish between "chicken," comprising broilers, fryers and certain other categories, and "fowl," which, Bauer acknowledged, included stewing chickens. This material would be impressive if there were nothing to the contrary. However, there was, as will now be seen.

Defendant's witness Weininger, who operates a chicken eviscerating plant in New Jersey, testified "Chicken is everything except a goose, a duck, and a turkey. Everything is a chicken, but then you have to say, you have to specify which category you want or that you are talking about." Its witness Fox said that in the trade "chicken" would encompass all the various classifications. Sadina, who conducts a food inspection

service, testified that he would consider any bird coming within the classes of "chicken" in the Department of Agriculture's regulations to be a chicken. The specifications approved by the General Services Administration include fowl as well as broilers and fryers under the classification "chickens." Statistics of the Institute of American Poultry Industries use the phrases "Young chickens" and "Mature chickens," under the general heading "Total chickens." and the Department of Agriculture's daily and weekly price reports avoid use of the word "chicken" without specification.

Defendant advances several other points which it claims affirmatively support its construction. Primary among these is the regulation of the Department of Agriculture, 7 C.F.R. § 70.300–70.370, entitled, "Grading and Inspection of Poultry and Edible Products Thereof." and in particular § 70.301 which recited:

> "*Chickens.* The following are the various classes of chickens:
> (a) Broiler or fryer . . .
> (b) Roaster . . .
> (c) Capon . . .
> (d) Stag . . .
> (e) Hen or stewing chicken or fowl . . .
> (f) Cock or old rooster . . .

Defendant argues, as previously noted, that the contract incorporated these regulations by reference. Plaintiff answers that the contract provision related simply to grade and Government inspection and did not incorporate the Government definition of "chicken," and also that the definition in the Regulations is ignored in the trade. However, the latter contention was contradicted by Weininger and Sadina; and there is force in defendant's argument that the contract made the regulations a dictionary, particularly since the reference to Government grading was already in plaintiff's initial cable to Stovicek.

Defendant makes a further argument based on the impossibility of its obtaining broilers and fryers at the 33¢ price offered by plaintiff for the 2½–3 lbs. birds. There is no substantial dispute that, in late April, 1957, the price for 2½–3 lbs. broilers was between 35 and 37¢ per pound, and that when defendant entered into the contracts, it was well aware of this and intended to fill them by supplying fowl in these weights. It claims that plaintiff must likewise have known the market since plaintiff had reserved shipping space on April 23, three days before plaintiff's cable to Stovicek, or, at least, that Stovicek was chargeable with such knowledge. It is scarcely an answer to say, as plaintiff does in its brief, that the 33¢ price offered by the 2½–3 lbs. "chickens" was closer to the prevailing 35¢ price for broilers than to the 30¢ at which defendant procured fowl. Plaintiff must have expected defendant to make some profit—certainly it could not have expected defendant deliberately to incur a loss.

Finally, defendant relies on conduct by the plaintiff after the first shipment had been received. On May 28 plaintiff sent two cables complaining that the larger birds in the first shipment constituted "fowl." Defendant answered with a cable refusing to recognize plaintiff's objection and announcing "We have today ready for shipment 50,000 lbs. chicken 2½–3 lbs. 25,000 lbs. broilers 1½–2 lbs.," these being the goods procured for shipment under the second contract, and asked immediate answer "whether we are to ship this merchandise to you and whether you will accept the merchandise." After several other cable exchanges, plaintiff replied on May 29 "Confirm again that merchandise is to be shipped since resold by us if not enough pursuant to contract chickens are shipped the missing quantity is to be shipped within ten days stop we resold to our customers pursuant to your contract chickens grade A you have to deliver us said merchandise we again state that we shall make you fully responsible for all resulting costs." [2] Defendant argues

---

2. These cables were in German; "chicken", "broilers" and, on some occasions, "fowl," were in English.

that if plaintiff was sincere in thinking it was entitled to young chickens, plaintiff would not have allowed the shipment under the second contract to go forward, since the distinction between broilers and chickens drawn in defendant's cablegram must have made it clear that the larger birds would not be broilers. However, plaintiff answers that the cables show plaintiff was insisting on delivery of young chickens and that defendant shipped old ones at its peril. Defendant's point would be highly relevant on another disputed issue—whether if liability were established, the measure of damages should be the difference in market value of broilers and stewing chicken in New York or the larger difference in Europe, but I cannot give it weight on the issue of interpretation. Defendant points out also that plaintiff proceeded to deliver some of the larger birds in Europe, describing them as "poulets"; defendant argues that it was only when plaintiff's customers complained about this that plaintiff developed the idea that "chicken" meant "young chicken." There is little force in this in view of plaintiff's immediate and consistent protests.

When all the evidence is reviewed, it is clear that defendant believed it could comply with the contracts by delivering stewing chicken in the 2½–3 lbs. size. Defendant's subjective intent would not be significant if this did not coincide with an objective meaning of "chicken." Here it did coincide with one of the dictionary meanings, with the definition in the Department of Agriculture Regulations to which the contract made at least oblique reference, with at least some usage in the trade, with the realities of the market, and with what plaintiff's spokesman had said. Plaintiff asserts it to be equally plain that plaintiff's own subjective intent was to obtain broilers and fryers; the only evidence against this is the material as to market prices and this may not have been sufficiently brought home. In any event it is unnecessary to determine that issue. For plaintiff has the burden of showing that "chicken" was used in the narrower rather than in the broader sense, and this it has not sustained.

This opinion constitutes the Court's findings of fact and conclusions of law. Judgment shall be entered dismissing the complaint with costs.