Argued July 8, affirmed in part, reversed in part September 29,
petition for rehearing denied November 23, 1965

## KINNAMAN *v.* BAILEY ET UX

406 P. 2d 145

*George P. Winslow,* Tillamook, argued the cause for appellant. On the briefs were Winslow & Winslow, Tillamook.

*Douglas E. Kaufman,* Tillamook, argued the cause for respondents. On the briefs were McMinimee & Kaufman, Tillamook.

Before McAllister, Chief Justice, and O'Connell,* Goodwin, Denecke and Lusk, Justices.

## GOODWIN, J.

Plaintiff in 1953 sold her dairy farm to the defendants under a contract which has been rendered, by changing marketing conditions in the dairy industry, both ambiguous and obsolete, at least from the point of view of the plaintiff. Plaintiff brought proceedings for a declaratory decree that would, if granted according to her prayer, require the defendants to increase their payments to her. She appeals from a decree of the trial court dismissing her complaint.

The contract of sale provided for payment for the farm in butterfat instead of in money. By the terms of the contract the purchasers were to operate the farm as a dairy farm, ship their milk to certain named dairy cooperatives, and order the cooperatives to disburse to the plaintiff the money value of 4,800 pounds of butterfat each year until payment was completed. Subsequent events have caused a disagreement be-

---

* O'Connell, J., did not participate in the decision in this case.

tween the parties with reference to two matters which were not covered by the contract.

The first, and most troublesome, omission was the failure of the contract to note that there existed in 1953, and still exists in the Tillamook County dairy industry, a "two-price" system of payment for milk produced and sold through the dairy cooperatives. Milk (butterfat) used in the Grade A, or bottle, trade is and was paid for at a substantially higher rate than is paid for the same milk (butterfat) if and when it is used in the manufacture of cheese.

The subject farm, at the time of its sale, was producing milk for a local cheese factory. The purchasers operated the farm as a "factory" farm for some eight years. In 1962 the purchasers, making substantial improvements to the barn and milk-handling equipment, obtained from the powers that control such quotas a Grade-A quota and began producing milk for the bottle trade. The principal dispute between the parties now is whether the plaintiff seller is entitled to have her payments for 4,800 pounds of butterfat annually since 1962 computed upon the prices paid the defendants for milk in the bottle trade or at the lower prices which would be paid for factory milk if the farm were still producing factory milk.

The contract merely provides that the defendants will operate the farm in a "good husbandmanlike manner according to the most approved methods for dairying," and that the defendants will ship all the milk produced on the farm to the named receiving cooperatives for the "highest going price." The defendants were under no contractual duty to operate a Grade-A farm. The contract does, however, require the defendants to "direct said Cheese Association to pay to  *   *   *

[the plaintiff] the proceeds for the amount of butter-fat" the plaintiff is entitled to receive.

The defendants objected to the introduction of most of the evidence concerning the intentions of the parties at the time of making the contract, arguing that the complaint had failed to allege any "fraud or mistake" in the contract. While it is true that the complaint does not, in so many words, allege a mistake, the contract is attached to the complaint and is made a part of it. (Fraud has never been an issue in this case.)

■ The ambiguity resulting from the failure of the contract to take account of the two-price system of payment for milk is extrinsic in that it is not manifest from reading the contract itself. ORS 41.740 provides that an exception to the parol-evidence rule is evidence "to explain an ambiguity, intrinsic or extrinsic." Since the two-price system in the dairy industry is and was a matter of common knowledge in the Tillamook area, we hold that the contract was ambiguous within the meaning of ORS 41.740. We are satisfied that the trial court properly received the evidence which was offered to shed light on the intent of the parties when they drew the contract. See *Frigaliment Importing Co. v. B.N.S. International Sales Corp.*, 190 F Supp 116 (SD NY 1960), and Corbin, The Interpretation of Words and the Parol Evidence Rule, 50 Cornell L Q 161 (1965).

■ We believe that the contract should be construed in the light of the facts existing at the time it was made. At that time, the farm was a factory farm and was sold as such. The plaintiff had her attorney draw the contract. If she wanted to share in the increased income that might accrue if the farm at some future

time should obtain a Grade-A quota, she could have included such a clause in the contract. The purchasers may or may not have agreed to such a bargain. Accordingly, we agree with the trial court's interpretation of the contract that the plaintiff was not entitled to the Grade-A price.

■ The other ambiguity in the contract is also an extrinsic one, and was brought about by conditions in the dairy industry which were not contemplated in 1953 when the contract was drawn. In 1953 and for many years prior thereto, virtually all the factory milk and most of the bottle-trade milk sold in Tillamook County was bought and paid for solely on the basis of the butterfat contained in the milk. Thus, if one farm, milking Jersey cows, produced milk that contained four per cent butterfat, and another farm, milking Holstein cows, produced milk that contained three and one-half per cent butterfat, and if butterfat was paid for at the rate of $1.00 per pound, the four per cent milk would be worth $4.00 per hundred pounds and the three and one-half per cent milk would be worth only 3.50 per hundred pounds. This system was well understood in the local economy, and, so the witnesses swore, had been unchallenged for many years as a reasonable and proper method of buying and selling milk.

A few years after the contract was written, however, the milk-consuming public apparently discovered cholesterol, and the esteem in which butterfat formerly had been held as a measure of the value of fluid milk began to be called into question. The record reveals that the Tillamook County dairy industry eventually resolved to pay farmers for milk by a new formula that gave increments of value to fluid milk, milk solids,

and butterfat. Thus, the local industry, insofar as the named cooperatives were concerned, ceased to pay for milk on the sole basis of its butterfat content, and paid for it on the new formula.

Even though the industry in the Tillamook area, since 1956, has been paying for milk under the new formula, the defendants have continued to deliver to the plaintiff each year only the money value of 4,800 pounds of butterfat. The plaintiff contends that because of the new price formula she is entitled to receive the money value of the fluid milk necessary to produce 4,800 pounds of butterfat annually. By way of illustration, again using an arbitrary measure of four per cent butterfat, or four pounds of butterfat in one hundred pounds of milk, it would take 120,000 pounds of fluid milk each year to produce 4,800 pounds of butterfat. If butterfat is worth $1.00 a pound, and fluid milk is worth $6.00 per hundred pounds, the butterfat in one hundred pounds of fluid milk is worth only $4.00, while the milk itself is worth $6.00. Thus, it is not surprising that the plaintiff seller wants the contract construed as a contract to pay her the money value of whole milk (the volume of which is computed by its butterfat content) and the purchaser wants to continue to pay for the farm by assigning to the seller only the value of the butterfat called for in the contract.

It is clear from the testimony that the farm was sold for butterfat instead of for money because the parties wanted to pay for the farm with the proceeds of a part of the milk produced upon it, whatever the value of such milk might be. At that time the value of milk was determined solely by its butterfat content.

The contract was written with the expectation that

it would protect both parties against adverse changes in the dairy industry. We believe that the parties intended to use butterfat solely as a measure of the volume of milk the proceeds of which were to be assigned each year to the plaintiff. The contract does not call for butterfat to be delivered to the plaintiff as butterfat, but calls for the purchasers to see to it that the cooperative distributes to the plaintiff the proceeds of her share of milk, paid for on the basis of its butterfat content. Since, at the time of the signing of the contract, the proceeds of butterfat were identical with the proceeds of the milk containing the butterfat, and since the parties had no reason to suspect that this circumstance would be altered during the life of the contract, we hold that it is a fair construction of the contract, in light of its extrinsic ambiguity, to grant the plaintiff's prayer with reference to the method of computing the volume of milk for which she is to be paid.

It follows that the trial court, while correctly denying the prayer for the Grade-A price, should have granted the prayer for a recomputation of the proceeds of milk, at factory prices, necessary to produce the 4,800 pounds of butterfat annually. The cause must be remanded for a recomputation of the sums due the plaintiff. If the parties are unable to agree upon these sums, the trial court should take whatever further evidence is necessary in order to dispose of the question. In the event a reference is employed for the accounting, it should be accomplished at the expense of both parties jointly.

Affirmed in part, reversed in part, no party to recover costs.