298 S.E.2d 803

**Rose OSNES, et al., etc.**

v.

**Frank MORRIS, et al., etc., et al.**

**No. 15155.**

Supreme Court of Appeals of
West Virginia.

Jan. 28, 1982.

Concurring Opinion Sept. 7, 1982.

Dissenting Opinion Dec. 14, 1982.

---

Miller, C.J., filed concurring opinion in which McGraw, J., joined.

Harshbarger, J., filed dissenting opinion.

Timothy N. Barber, Charleston, for appellants.

Jackson, Kelly, Holt & O'Farrell, Thomas E. Potter and James R. Snyder, Charleston, for appellees.

NEELY, Justice:

This case concerns the same church controversy that was before the Court in *Board of Church Extension v. Eads*, 159 W.Va. 943, 230 S.E.2d 911 (1976). In that earlier case the Board of Church Extension and Home Missions of the Church of God, Anderson, Indiana, brought an action to obtain title to church property in Gilboa, Nicholas County, under a reverter clause in a deed.[1] This Court found that

---

1. The reverter clause in question says:

"In the event this property falls into disuse, or if in the opinion of said General Ministerial Assembly, the local church at the above address, is no longer in fellowship and doctrinal unity with the Church of God, as represented by its General Assembly, this property shall go to, vest in, and become the property, in fee simple, of the Board of Church Extension and

Home Missions of the Church of God, Anderson, Indiana."

We speak of this clause as a "reverter" for convenience; as we pointed out in the earlier case, it is technically an executory limitation creating an interest which takes effect at the expiration of a prior interest. *Restatement, Property,* § 47 (1936).

the conditions triggering the reverter clause had not been met and that the plaintiff, an incorporated church, lacked the capacity to sue in West Virginia.

In the original case the determination that the Gilboa Church in Nicholas County, West Virginia, was no longer in fellowship and doctrinal unity with the Church of God was made by the Executive Council of the Church of God, Inc., which was an organ of the General Ministerial Assembly. We found that the by-laws of the General Ministerial Assembly did not grant that corporation any power to act on behalf of the General Ministerial Assembly concerning the interpretation of church doctrine or the determination of defection from church doctrine. Consequently, we held that the condition in the reverter clause had not been met since there was no resolution by the General Ministerial Assembly itself that the Gilboa church was no longer in fellowship.

Furthermore, although it was not necessary for the resolution of the case, we found that *W. Va. Const.*, art. VI, § 47 prohibits an incorporated church from holding property in West Virginia and that *W. Va. Code*, 31–1–79 [1965] provided that: (1) no church can do business in a corporate capacity as an out-of-state corporation; (2) no corporation can hold property or maintain any action, suit, or proceeding without qualifying to do business in West Virginia; (3) failure to qualify may be used as a plea in abatement against any corporation that attempts to sue in West Virginia; and (4) a cause of action arising out of the holding of property or transacting business is specifically included among those causes of action to which a plea in abatement would lie under the 1965 statute.

After we rendered our opinion, the Board of Church Extension set out to cure the defects which had caused the dismissal of their action in *Eads, supra.* On 16 June 1977 the General Assembly of the Church of God adopted a resolution declaring the Gilboa church to be out of fellowship and doctrinal unity with the Church of God. The appellees maintain that this resolution triggered the reverter clause which caused

title to the Gilboa church property to vest in the Board of Church Extension and Home Missions, a Corporation.

The Board subsequently conveyed the property to the appellees, the Executive Committee of the General Assembly and Ministerial Association of the Church of God of West Virginia, an unincorporated organization, as trustees. Appellees then brought a new action in the Circuit Court of Nicholas County to obtain possession of the property in question. In the court below they successfully argued that the condition in the deed triggering the reverter clause had been met and that the objection that the property interest was held by an incorporated church contrary to *W. Va. Const.*, art VI, § 47, had been eliminated because the property interest had been conveyed to individual trustees legally entitled to hold the property. The circuit court agreed with the appellees and awarded them the property. We disagree and reverse.

## I

The appellants assert that the entire issue is *res judicata.* We find, however, that the doctrine of *res judicata* does not apply to this case. At the time the appellees' predecessor in title, the Board of Church Extension, brought its original action, it had no right to enter the property whatsoever because the event triggering the reverter clause had not occurred. Consequently, the action should have been dismissed for failure to state a claim upon which relief could be granted. While we discussed in *Eads, supra,* the limitations on a corporation's holding land in West Virginia, and referred to the corporation law in effect at the time the action was brought, which permitted pleas in abatement to actions brought by corporations not authorized to do business, that discussion was essentially dicta. Furthermore, since the original action was brought, *W. Va. Code*, 31–1–79 [1965] has been repealed and civil penalties have now replaced the earlier sanction of a plea in abatement. *W. Va. Code*, 31–1–66 [1974].

## II

The question before us now, therefore, is not one of *res judicata* but rather whether the incorporated church could ever have received an interest in the real estate in the face of *W.Va. Const.*, art. VI, § 47. *W.Va. Const.*, art VI, § 47 says:

No charter of incorporation shall be granted to any church or religious denomination. Provisions may be made by general laws for securing the title to church property, and for the sale and transfer thereof, so that it shall be held, used, or transferred for the purposes of such church, or religious denomination.

This constitutional provision descended to us from the State of Virginia. *Powell v. Dawson*, 45 W.Va. 780, 32 S.E. 214 (1899). Furthermore, this constitutional provision is the legitimate progeny of the English statutes of mortmain which played a central role in the law of property in England. In *Goetz v. Old National Bank of Martinsburg*, 140 W.Va. 422, 434, 84 S.E.2d 759, 768 (1954) we noted:

In our opinion, the decisions of this Court relative to religious trusts do not grow out of hostility to any church or religious organization, but they probably have their origin in the statutes of mortmain, as well as the undeviating purpose of the founders of our government to separate church from state. See Black's Law Dictionary, 4th Edition, page 1163.

and, as the Court said in *Lathrop v. Commercial Bank*, 38 Ky. (8 Dana) 114, 33–34 American Decisions 481 (Ky., 1839) at 489:

The prime object of the mortmain acts was to repress the alarming influence of ecclesiastical corporations, which had, even as early as the Norman conquest, monopolized so much of the land in England, that the abbot of St. Albans told the conqueror that the reason why he had subjugated the country by the single victory at Hastings was, "because the land, which was the maintenance of martial men, was given and converted to pious employments, and for the maintenance of holy votaries." The thirty-sixth chapter of Magna Charta, which was the first statutory enactment on this subject,

declares that "it shall not be lawful, from henceforth, to any to give his lands to any religious house, and to take the same lands again to hold of the same house, etc., upon pain that the gift shall be void, and that the land shall accrue to the lord of the fee."

The precedent that any conveyance to an ecclesiastical corporation in contravention of the statutes of mortmain is absolutely void, and not voidable, is overwhelming. In fact, in all of the statutes of mortmain except 7 Edward I stat. 2 up until the American Revolution, the word "void" is used expressly. For example the statute of 9 Hen. III, c. 36 provides:

If any from henceforth give his Lands to any Religious house, and thereupon be convict, the Gift shall be utterly void, and the Land shall accrue to the Lord of the Fee.

While the act of 7 Edw. I stat. 2 on the subject of mortmain does not use the word "void" explicitly, it uses the word "forfeit" which, in the context of the statute, has the same meaning.

The appellees maintain that an improper conveyance to an incorporated church is not utterly void, but voidable only, and that any action to void the conveyance must be brought by the sovereign. Yet 7 Edward I stat. 2 is most persuasive against appellees on this point since it expressly provides for private enforcement of the policy against ecclesiastical accumulation. Under the scheme of that statute, each mesne lord in succession (under the English scheme of military tenure) could enter any estate illegally conveyed for church purposes. Thus if the immediate lord of the person who made the improper conveyance did not enter, then the next higher lord could do so after a year, and so forth until finally the king was entitled to enter. It is in this sense that the word "forfeit" is used in this statute, since the improperly conveyed estate is forfeited to interested, yet private persons. This, possibly, was the first recognition of the impossibility of public enforcement of the policy of mortmain.

The statute of 23 Hen. VIII, c. 10 provides as follows:

Be it therefore enacted by the King ... That all and every such uses, intents, and purposes, of what name, nature or quality they shall be called, that shall be devised, covenanted, made, declared, or in any wise ordained after the first day of March, in the three and twentieth year of the reign of our sovereign lord King Henry the eighth, by any feoffee, recoverer, or conisee, or by any other person or persons to whose use any such feoffee, recoverer, or conisee shall be seised, of any manors, lands, tenements, or hereditaments, or of the issues, revenues, and profits of them, or any of them, *shall be utterly void,* and of no strength, virtue, nor effect in the law. [Emphasis supplied]

Finally we find in the statute of 9 George II, c. 36, the following provision:

That all gifts, grants, conveyances, appointments, assurances, transfers, and settlements whatsoever, of any lands, tenements, or other hereditaments, or of any estate or interest therein, or of any charge or incumbrance affecting or to affect any lands, tenements, or hereditaments, or of any stock, money, goods, chattels, or other personal estate, or securities for money to be laid out or disposed of in the purchase of any lands, tenements, or hereditaments, or of any estate or interest therein, or of any charge or incumbrance affecting or to affect the same, to or in trust for any charitable uses whatsoever, which shall at any time, from and after the said twenty fourth day of June, one thousand seven hundred and thirty six, be made in any other manner or form than by this act is directed and appointed, *shall be absolutely, and to all intents and purposes, null and void.* [Emphasis supplied]

It also appears that American authority is largely to the effect that a conveyance in contravention of a statute of mortmain is void where ownership can automatically devolve to a successor who has a just interest in the property. For example, in I Minor's Institutes 612 the learned commentator says:

Unfortunately our statute does not expressly declare, as the English statutes of *mortmain* do, what shall be the *consequences* of a corporation's acquiring more lands than it is permitted to hold. The better opinion, *upon principle,* seems to be that, as the corporation grantee *cannot hold* the surplus contrary to law, and as the grantor *cannot have it back* against his deed, it *must be forfeited* to the commonwealth, as where an alien illegally purchases lands.

The difficulty of applying the law of mortmain in the United States is that all land ownership in this country is alodial and not tenurial. By the term "tenurial" we mean land held by one as tenant of a superior on condition of the rendition of services. 1 Tiffany, *The Law of Real Property* § 12 at 17 (3rd Ed. 1939). While in England there was always a paramount lord to enter upon such lands as were conveyed contrary to the acts of mortmain, here there are no lords to enter. Consequently, in this country the rule appears to be that where the estate can pass quietly and by operation of law to an heir, holder of a future interest, or as in this case, a person in possession who would be ousted by the interest prohibited by mortmain, the illegal interest in property is considered void and the estate either passes to the holder of a future interest, appropriate heir at law, or the person in possession.

In the case of *In re McGraw's Estate,* 111 N.Y. 66, 19 N.E. 233 (1888) the court said:

The nature of the tenure of real property at the time of the passage of the early mortmain acts in England bears no resemblance to the tenure by which a citizen of this state holds lands. Here there is no vassal and superior, but the title is absolute in the owner, and subject only to the liability to escheat ...

A devise to a corporation which is forbidden to take (or forbidden to hold, if the word, under the circumstances of the case, is construed to include a taking also) does not, therefore, give a title subject to the right of some superior to claim a forfeiture of the land; but, if it

be in violation of a statute, I think the devise is void, and the land descends to the heir or residuary devisee. 111 N.Y. at 94, 19 N.E. at 247

In the case before us we do not have a grantor who is asserting the illegality of his own conveyance. Were that the case, equity would certainly imply an obligation on the part of the grantor to reconvey to a person or persons eligible to receive the land. The implication, however, is that the doctrine of unjust enrichment would possibly prevent a grantor from asserting the invalidity of his own conveyance. If, however, there is a *bona fide* successor in interest or a *bona fide* party in possession (who would be ousted by operation of an illegal executory limitation which takes effect at the expiration of a prior interest), the illegal estate is void and either the successor takes immediate possession or the title to the land remains in those in possession who would otherwise be ousted. Whether, in the instance of a gift in contravention of mortmain, the conveyance itself might be void is a far closer question and would depend on the facts. The court illuminated the complexity of the gift problem in *In re McGraw's Estate, supra:*

> The case of an executed gift without consideration by a donor, by an absolute delivery to a corporation without power to take, is also instanced, and the question is asked whether the title vests in such a case in the corporation so that the donor or his heirs could not recover it back, and, if it does, the counsel asks where is the difference in the two cases. It is time enough to decide such a case when it arises. But it seems to me there is a decided difference. In the one case the gift is made *inter vivos* by the absolute owner, and it is made effectual as to him by a delivery. In such case it would seem that he stands in no position to ask the aid of the court to get him out of a situation into which he voluntarily entered with his eyes open, and the court might well say to him that he stood in no position to attack the right of his donee to property which he freely and absolutely gave it. As to his heirs, it could be said that their ancestor had made a dis-

position of property which was absolutely his own in his life-time, and in such a way that he could not question its validity, and that, as he could not, they, succeeding only to his rights, were alike disabled.

111 N.Y. at 110, 19 N.E. at 255.

In *Goetz v. Old National Bank of Martinsburg, supra,* this Court recognized the distinction between bequests of personal property and devises of real estate made to religious organizations. We noted that even though incorporation of a church is illegal in this State, "if there is a foreign corporation validly and legally established under the laws of another state, a bequest made in this State is valid if such foreign corporation be named." 140 W.Va. at 433, 84 S.E.2d at 768. *Accord: University v. Tucker,* 31 W.Va. 621, 8 S.E. 410 (1888).

This rule was set forth again in *Osenton v. Elliott,* 73 W.Va. 519, 81 S.E. 837 (1914) when the Court upheld a bequest of money to a Tennessee corporation, The Board of Trustees of the Methodist Episcopal Church, South:

> Nor is the bequest invalid because made to a foreign corporation for the general benefit of a religious denomination. That corporation is one authorized to take and hold such a bequest by the laws of the state of its creation. True, no such corporation can be created under the laws of this State, to be devoted to general religious purposes. Many such bequests have been upheld. [citation omitted] Let it be clearly understood that there is nothing in our laws or policy against the dissemination of religion or 'the true advancement of Christianity.' The early Virginia policy against mortmain still recognized in this State is a different thing. It prevents aggrandizement by local churches within the State and unnecessary accumulation of property by them. To this end our State issues no charters of incorporation for religious purposes, limits the amount of land that may be held by a local church, and validates no indefinite devises or bequests to churches. Yet that policy was never intended to retard the

dissemination of religion. Rather it was intended to foster a religion of the heart, not one perverted by wealth and power. 73 W.Va. at 526–527, 81 S.E. at 840.

### III

The appellees cite *State v. Home Mission Society*, 96 W.Va. 447, 123 S.E. 440 (1924) for the proposition that only the sovereign can challenge a void conveyance to an incorporated church. The facts of *Home Mission* are quite complex, but the case essentially involved the efforts of a Baptist minister to convey his property to the incorporated Home Mission Society. The distinguishing feature of that case was that both the grantor and the Mission Society attempted to rectify the violation of our law before the transfer was challenged by making a new deed to an individual trustee. Furthermore, there was no party holding a legitimate interest in the property who could enter into possession of the estate. The court quoted *Fritts v. Palmer*, 132 U.S. 282, 10 S.Ct. 93, 33 L.Ed. 817 (1889) to the effect that a conveyance in contravention of a statute of mortmain "is valid until assailed in a direct proceeding instituted for that purpose." But if the challenger is in possession, need he bring an action? Certainly not; he may wait until his disseisor seeks to oust him and assert his challenge by counterclaim. Obviously, therefore, this Court followed the logic of *In re McGraw's Estate, supra*, although we did not cite that case or develop a tightly reasoned analysis which explored the problem in any depth.

While this Court quoted other courts that had asserted that a challenge to ownership by a corporation in contravention of an act of mortmain must be brought by the sovereign, this Court did not decide that specific point in *Home Mission Society*. The only authority this Court cited in *Home Mission Society* for the assertion that the sovereign alone can attack a voidable conveyance to an incorporated church came from cases involving secular corporations that were holding land either in contravention of their charters or in contravention of statutory law. In the case before us, however, we are dealing with an ecclesiastical corporation and a constitutional prohibition—a situation far closer by analogy to those to which the original statutes of mortmain applied. Furthermore, since the action in *Home Mission Society* had been brought by the State, the observations on how an action could be brought were entirely dicta. Finally, and most persuasively, in *Home Mission* no challenge had been made to the improper transactions in the chain of title until *after* all defects had been cured by the parties themselves. There was no one, other than the State, who sought to challenge the transactions.

### IV

While there may be cases where it would be both inequitable and serve no legitimate public purpose to strike down conveyances from incorporated churches to others capable of holding the property, particularly when innocent third parties have come to rely to their detriment on the void conveyance, such is not the situation before us. Here we have the most insidious of all property interests, a reverter clause, which is capable of lying dormant for years in the hands of an institution which is disqualified by our *Constitution* from holding such an interest. Furthermore, there is no problem about what happens to the property in the event the interest is declared void, since appellants are in possession and it is the unlawful interest alone that will actively disseise them.

If we were to hold that such reversionary interests in land were voidable only, then incorporated churches could influence and direct the use of real property in this State for centuries in complete reliance that they could correct the defect in their title at any moment they chose to assert their right of entry. Therefore, while we can envisage situations where equity would require the tempering of the general rule, we hold that conveyances of interests in real property to incorporated churches in contravention of *W.Va. Const.*, art 6 § 47 are utterly void where the estate is capable of passing automatically to another who would have an interest in such land but for

the void estate. Consequently, the conveyance at issue in this case to an out-of-state corporation was absolutely and utterly void *ab initio* and the Board of Church Extensions and Home Missions had nothing to convey to the individual appellees in this case.

Accordingly, for the reasons set forth above the litigation on this issue is now at an end and the judgment of the Circuit Court of Nicholas County is reversed: Judgment is entered for the appellants in this Court.

Reversed; Judgment for Appellants entered in this Court.

MILLER, Chief Justice, concurring:

I concur in the end result reached by the majority, but on the narrow grounds that the matter at issue is foreclosed by this Court's former opinion in *Board of Church Extension v. Eads*, 159 W.Va. 943, 230 S.E.2d 911 (1976). Although the majority concludes that the doctrine of *res judicata* is not applicable, it does so with no discussion of the principle. It is clear from *Eads* that the Court did discuss the issue of the right of a foreign corporation to hold land or bring an action in this State under W.Va.Code, 31-1-79 (1965), as demonstrated by Syllabus Points 5 and 6.¹ In Syllabus Point 1 of *Pearson v. Dodd*, 159 W.Va. 254, 221 S.E.2d 171 (1975), we gave the following test for the application of *res judicata:*

"To justify the application of the doctrine of *res judicata*, ' * * * there must be a concurrence of four conditions, namely: (1) identity in the thing sued for; (2) identity of the cause of action; (3) identity of persons, and of parties to the action; (4) identity of the quality in the person for or against whom the claim is made.' Opinion. *Marguerite Coal Co. v. Meadow River Lumber Co.*, 98 W.Va. 698 [, 127 S.E. 644]." *Syllabus, Hannah v. Beasley*, 132 W.Va. 814, 53 S.E.2d 729 (1949).

*See also Moore v. Sun Lumber*, 166 W.Va. 735, 276 S.E.2d 797, 800–01 (1981).

In *Hannah v. Beasley*, 132 W.Va. 814, 820, 53 S.E.2d 729, 732 (1949), after stating a substantially similar rule, we quoted with approval this statement from *Kemp v. Miller*, 166 Va. 661, 674, 186 S.E. 99, 103 (1936):

"When a second suit is between the same parties as the first, and on the same cause of action, the judgment in the former is conclusive of the latter, not only as to every question which was decided, but also as to every other matter which the parties might have litigated and had determined, within the issues as they were made or tendered by the pleadings, or as incident to or essentially connected with the subject matter of the litigation, whether the same, as a matter of fact, were or were not considered. As to such matters a new suit on the same cause of action cannot be maintained between the same parties."

There can be no doubt that at the time of *Eads*, a rupture had occurred between the local church and the Indiana church corporation. There was no question in *Eads* but that the Indiana church corporation was claiming ownership of the property through the reverter clause. The majority in *Eads* found that the condition triggering

---

1. Syllabus Points 5 and 6 of *Eads, supra,* state:
   "5. A non-resident corporation which is directly responsible to the General Assembly of the Church of God and has general responsibility in the area of home missions work among American Indians and minority groups, makes loans to congregations who are building, takes care of conditional deeding of church property, and has responsibilities in the area of evangelism and building fund campaigns is a church within the contemplation of *W.Va. Const.*, art. VI, § 47, and under *W.Va.Code*, 31-1-79 [1965] cannot qualify to do business or conduct business in a corporate capacity in this State.

   "6. Under *W.Va.Code*, 31-1-79 [1965] a nonresident church corporation could not maintain an action as a party plaintiff in a court of this State, and as the prohibition against a church corporation's maintaining an action is in furtherance of a legitimate public policy enunciated in *W.Va. Const.*, art. VI § 47 and is not a burden upon interstate commerce such as to invalidate it by virtue of the Commerce Clause of the *Constitution of the United States*, such a provision is valid and will be enforced."

the reverter clause had not been met, which was a resolution that the local church was no longer in fellowship and doctrinal unity. However, the status of the foreign church corporation's right to hold a property interest in this State was still a viable issue. Regardless of when the reverter was triggered, the property interest would have to pass to the foreign church before it could be reconveyed to trustees.

The *Eads'* dissenting opinion suggests that the defects of the foreign church corporation could be easily cured, and, in fact, this current litigation was brought about by the church's passing a proper doctrine out of unity resolution and conveying the property to trustees. The present suit challenges the validity of the reverter title of the Indiana corporation and its conveyance of the property to trustees.

I do not believe the doctrine of *res judicata* can be so easily brushed aside as the majority has done. The underlying policy of *res judicata* is to put an end to litigation once there has been a proper hearing and to preclude parties from piecemeal litigation. *See generally* 46 Am.Jur.2d *Judgments* § 395, *et seq.* (1969); *Moore v. Sun Lumber Co., supra.* The fact remains that the validity of the foreign church corporation's right to hold the property and to transfer it to trustees is still the central issue in this case. This was the same issue decided in *Eads* and, therefore, I believe that the doctrine of *res judicata* forecloses our consideration of this appeal.

Regrettably, the majority rejects any analysis of the doctrine of *res judicata* and proceeds to discuss our prohibition against a church incorporating in this State as found in Section 47 of Article VI of the West Virginia Constitution as a species of statutory mortmain.[2] The majority fails to understand that the English mortmain statutes, which were designed to prevent or restrict the conveyance of land to any corporation, was a result of the peculiar nature of the English feudal system and the rights it gave to the overlord. Such statutes were not directed solely against religious corporations. *See* II Scott, *Law of Trusts* §§ 96.2, 117.1 (3rd ed. 1967). Comparable mortmain statutes were enacted in England against charitable trusts holding real property, including the Georgian Statute of Mortmain, 9 Geo. II, ch. 38 (1736), which was cited by the majority in *Eads. See also* IV Scott, *Law of Trusts* § 362.3 (3rd ed. 1967).

The majority's reliance on these English mortmain statutes which restricted the transfer of property to corporations, as a means of illuminating the meaning of our constitutional provision against incorporation of churches, is a dubious exercise at best. In fact, the English mortmain statutes were never thought to be in force in this country unless they had been legislatively adopted. *Perin v. Carey,* 24 How. (US) 465, 16 L.Ed. 701 (1860); *Hubbard v. Worcester Art Museum,* 194 Mass. 280, 80 N.E. 490 (1907); *Rivanna Navigation Co. v. Dawson,* 3 Grat. 19, 46 Am.Dec. 183 (Va.1846). Moreover, the mortmain statues have now been abolished in England. IV Scott, *Law of Trusts* § 362.3 (3rd ed. 1967); Note, *Mortmain Statutes: Questions of Constitutionality,* 52 Notre Dame Lawyer 638 (1977). If we were dealing with W.Va.Code, 35–1–8 (1923), which restricts the amount of land that church trustees can hold, some analogy to the mortmain statutes might be helpful, but in this case the reliance on mortmain statutes is misplaced.

If I were to deal with our constitutional provision prohibiting a church from incorporating in this State, as it relates to the issue in this case as to whether a foreign church corporation can acquire title to real estate, I would do so on general law as to the validity of such deed. Despite the majority's view of *State v. American Baptist Home Mission Society,* 96 W.Va. 447, 123 S.E. 440 (1924), that case provides a partial

---

**2.** Section 47 of Article VI of the West Virginia Constitution provides:

"No charter of incorporation shall be granted to any church or religious denomination. Provisions may be made by general laws for securing the title to church property, and for the sale and transfer thereof, so that it shall be held, used, or transferred for the purposes of such church, or religious denomination."

solution to this problem by holding that a deed to a foreign church corporation is not void *ab initio*. This means that if such foreign corporation conveys title to a third party before any challenge is made to the title, such third party obtains a valid title. This appears to be the general law elsewhere and has the beneficial effect of preserving land title. Annot., 37 A.L.R. 200 (1925); Annot. 62 A.L.R. 494 (1929); 36 Am.Jur.2d *Foreign Corporations* § 171 (1968).

Here, where there is a present controversy over the right of the foreign corporation to hold under the reverter clause, I believe that the original grantees would have standing to challenge the validity of the reverter clause. The situation is analogous to *United Fuel Gas Co. v. Hill*, 112 W.Va. 10, 163 S.E. 613 (1932), where we permitted assignees of the original grantor to challenge a church's right to hold property under a reverter clause. The reverter clause provided that the property would revert to the grantor if the church discontinued use for more than a year of the church building located on the property. In *Hill*, this Court recognized the general statement announced in *American Baptist Home Mission Society, supra*, that only the State could challenge a deed to an incorporated church. The Court also indicated that the operation of the reverter clause could be separately challenged by the grantor's assignees, citing *United Fuel Gas Co. v. Morley Oil & Gas Co.*, 102 W.Va. 374, 135 S.E. 399 (1926). The same rights of the grantor's assignees would, of course, belong to the grantors, as in this case.

From a policy standpoint, this position makes sense to me as it involves an attack on a reverter interest by those presently owning the fee. Such litigation is designed to settle who has the present fee interest and will involve all of those who have a current ownership interest in the property. It does not attempt to upset a deed that conveys a fee ownership that is absolute on its face, nor does it involve those who may be bona fide purchasers under such deed. These latter types of challenges are precluded under *American Baptist Home Mission Society, supra*, because they obviously can lead to attacks on legal titles many years after the title has passed out of the hands of the original grantee who was prohibited by some statutory or constitutional enactment from holding property.

In the present case, because the litigation is between the current owners of the fee and the holders of the reverter interest, the policy against unsettling land titles does not apply. I would conclude that the Indiana church corporation is not entitled to assert its reverter interest. The reason for this conclusion is found in *Lunsford v. Wren*, 64 W.Va. 458, 63 S.E. 308 (1908), where we held that our constitutional provision

> "inhibit[s] the granting of any charter of incorporation to any church or religious denomination. An attempt to create such a corporation would be void, and confer upon it, as such, no powers of contract or other corporate powers. *Powell v. Dawson*, 45 W.Va. 780, 32 S.E. 214."

Under *Lunsford's* reasoning, the incompetency of such church to incorporate precludes its ability to sue, contract or take property in its corporate capacity in this State. This is independent of any provision of our corporation law.

I am authorized to state that Justice McGRAW joins me in this concurrence.

HARSHBARGER, Justice, dissenting:

I cannot agree with the majority because it vests title to this property in the very people the grantors did *not* want to have it, persons not in fellowship and doctrinal unity with their church.

Perhaps my Brothers were overcome by the great mass of words Justice Neely put upon his paper, and lost sight of our main business. We are not here to prove how erudite we are, at the expense of reason and justice. Befogged and betwitched by extensive references to ancient texts, we have here worked an injustice simply by showing how smart we are, and delighting therein, overlooked simple, basic rules about deeds.

The language in these two deeds makes it clear that they intended that the grantors wanted their property be used as a church by people in doctrinal unity with their Church of God:

It is understood and agreed that the Trustees of Gilboa Church of God, and their successors in office, shall have the benefits and privileges of all rights hereunder as long as said church maintains fellowship and doctrinal unity with the General Ministerial Assembly of the Church of God, which meets annually at Anderson, Indiana.

In the event this property falls into disuse, or if in the opinion of said General Ministerial Assembly, the local church at the above address, is no longer in fellowship and doctrinal unity with the Church of God, as represented by its General Assembly, this property shall go to, vest in, and become the property in fee simple, of the Board of Church Extension and Home Missions of the Church of God, Anderson, Indiana.

The majority called these second interests to take effect if the congregation became un-Church of God, reverter clauses. What was created, however, were determinable fees to last "as long as" the church maintained doctrinal fellowship with the General Assembly.

A fee simple determinable may be limited by either a possibility of reverter to whoever was the grantor, or by an executory interest that moves the title to a second entity. *Woman's Club of St. Albans v. James,* 158 W.Va. 698, 213 S.E.2d 469, 473 (1975). *See generally* 1 Simes and Smith, The Law of Future Interests (2d Ed.) §§ 221–232 and §§ 281–294 (1956). Here, the second entity apparently cannot take because of W.Va. Const. art. VI, § 47 and W.Va.Code, 35–1–1, *et seq.*, and 31–1–79, that prevent an incorporated church from owning property in West Virginia.

Here we have deeds wherein were created estates that were fee simple determinable, and the limitations over failed because the successor grantee is prohibited to take. *See First Universalist Society of North Adams v. Boland,* 155 Mass. 171, 29 N.E. 524 (1892); *City of Klamath Falls v. Bell,* 7 Or.App. 330, 490 P.2d 515 (1971).

The grantors' intent is crystal clear. Simes and Smith conclude in § 828, in Volume 2 of their treatise, *supra:*

[T]hat in any case where the cause of a failure is not violation of the rule against perpetuities, *the court should be free to hold that the prior interest is divested if it appears that the settlor or devisor would probably have preferred it to be divested.* In other words, *it should be possible to infer that the happening of the event will operate as a divesting condition even though the subsequent interest which was supposed to take effect is for some reason eliminated in its inception.* The actual decisions appear to be reconcilable with the proposition that, where the rule against perpetuities or some related rule is not involved, *the prior interest will be divested on failure of the succeeding interest in any case where that would most nearly accord with the probable intent of the settlor.* It would seem that this intent should be arrived at by a process of construction which includes a consideration of the fact that the succeeding interest has failed. But, if it is impossible to make any inference as to the testator's intent, then it is believed to be more nearly in accordance with the position of the American courts to say that there is a presumption that the preceding estate is not divested. (Emphasis supplied, footnote omitted.)

The limitations here should be construed as creating possibilities of reverter, which matured, vesting title in the grantors; * or

---

* Many courts and authorities have followed this reasoning: *McCrory School District of Woodruff County v. Brogden,* 231 Ark. 664, 333 S.W.2d 246, 250–51 (1960); *Fletcher v. Ferrill,* 216 Ark. 583, 227 S.W.2d 448, 451, 16 A.L.R.2d 1240 (1950); *Brown v. Independent Baptist Church,* 325 Mass. 645, 91 N.E.2d 922, 924 (1950); *Insti-*

*tution For Savings v. Roxbury Home for Aged Women,* 244 Mass. 583, 139 N.E. 301, 303 (1923); *First Universalist Society of North Adams v. Boland, supra; City of Klamath Falls v. Bell, supra; In Matter of Estate of Pruner,* 400 Pa. 629, 162 A.2d 626, 633 (1960); *Yarbrough v. Yarbrough,* 151 Tenn. 221, 269 S.W. 36, 39

they could be reformed by "equitable modification" to effectuate the grantors' intention, putting the title in the local trustees who agreed with the doctrine of the General Assembly. *Berry v. Union National Bank,* 164 W.Va. 258, 262 S.E.2d 766 (1980).

*Berry* dealt with this question, but in a will context. To satisfy these grantors' intent, I would modify the invalid executory limitations to the foreign corporation church, and would put title in appellees, Rose Osnes, David K. Lynch, Frank P. Goode, Larry M. McCallister, and Richard Bradley, in their capacities as the Executive Committee and Trustees of the General Assembly and Ministerial Association of the Church of God of West Virginia, and their successors in office.

I emphatically would not leave the property with those who the grantors by unmistakable expression, did not want to have it.

(1925); *County School Board of Scott County v. Dowell,* 190 Va. 676, 58 S.E.2d 38, 44 (1950). *See* Restatement, Property (2d) § 228, comment b.; Annot., Application of Rule Against Perpetuities to Limitation Over On Discontinuance of Use for Which Premises are Given or Granted, or the Commencement of a Prohibited Use, 45 A.L.R.2d 1154, 1163; 2 Simes and Smith, *supra* at § 823–828.